Non-Confidential

CORRECTED

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. STEPHEN A. VADEN, JUDGE

Shanghai Tainai Bearing Co., Ltd. and
C&U Americas, LLC,

                  Plaintiffs,

   and

Zhejiang Jingli Bearing Technology Co.,
Ltd.,

                  Plaintiff-Intervenor,

    v.

United States.

                Defendant.

Ct No. 23-00020

**MEMORANDUM OF LAW IN SUPPORT OF THE
RULE 56.2 MOTION OF PLAINTIFFS
SHANGHAI TAINAI BEARING CO., LTD. AND
C&U AMERICAS, LLC, FOR JUDGMENT
UPON THE AGENCY RECORD**

David J. Craven, Esq.
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
   Counsel for Plaintiffs

Dated: July 13, 2023

Table of Contents

Table of Contents....................................................................................................i

Table of Authorities ............................................................................................. ii

I.    Introduction...................................................................................................1

II.   Statement pursuant to Rule 56.2(c) ...........................................................2

      A. Administrative determination under review...............................................2

      B. Issues of law ...........................................................................................3

      C. Summary of arguments ...........................................................................3

      D. Statement of facts ..................................................................................4

III.  Standard of review.......................................................................................9

IV.   Argument ...................................................................................................14

      A. The Department should not take averse inferences against a fully
         cooperative entity ..................................................................................14

         1. Tainai was fully cooperative and answered all of the
            Department questionnaires...............................................................18

         2. Tainai attempted to obtain information from its third party
            suppliers, but was unable to obtain cooperation ...............................20

         3. Court precedent does not require a party to provide information
            not in its possession and which it cannot reasonably obtain...............24

      B. The Department should not value inputs of finished components
         with partial adverse facts......................................................................26

      C. The factors of production selected by the Department as partial
         adverse facts were highly distorted .......................................................27

      D. The Department should not have deducted 301 duties from the
         U.S. price................................................................................................29

      E. The Department should not have capped the addition to the U.S.
         price for 301 duties.................................................................................32

      F. The Department should have granted a by-product offset......................37

V.    Conclusion .................................................................................................37

TABLE OF AUTHORITIES

*Court Cases:*

*Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F.3d 1339 (Fed. Cir. 2015)....................................................................................19

*ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012) ......................................................................................................12

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) .............10,11

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023) ................................................................................31

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974)............................................13

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1377 (Fed. Cir. 2012) ..................................................................... 13,19

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984)..................................................................................................9,10

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) ........................10

*Daewoo Elec. Co. v. United States*, 712 F.Supp. 931 (Ct. Int'l Trade 1989) ......................................................................................................25

*Diamond Sawblades Manufacturers' Coalition v. United States,* 986 F.3d 1351 (Fed. Cir. 2021) .....................................................................27,28

*Diversified Products Corp. v. United States*, 6 CIT 155 (1983) ............................11

*Dorbest Ltd v. United States*, 462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ......................................................................................................12

*Ferrostaal Metals Gmbh v. United States*, 518 F. Supp. 3d 1357 (Ct. Int'l Trade 2021)..............................................................................................25

*Floral Trade Council v. United States*, 41 F.Supp.2d 319 (Ct. Int'l Trade 1999)..............................................................................................33

*Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034 (Fed. Cir. 1996).......................10

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997).....................11

*Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183 (Ct. Int'l Trade 2009)..............................................................................................11

*Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301 (Fed. Cir. 2009)...................13

*Mannesmannrohen-Werke AG v. United States,* 23 CIT 826, 77 F. Supp. 2d 1302 (1999) ....................................................................15

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016) ...............................................................................12

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) 14,15,17,18,19

*Novosteel SA v. United States,* 284 F. 3d 1261, 1276 (Fed. Cir. 2002)..................13

*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995) ....................27

*Olympic Adhesives, Inc. v. United States,* 899 F. 2d 1565 (Fed. Cir. 1990) ...............................................................................24,25

*Peer Bearing Co. v. United States*, 182 F.Supp.2d 1285 (Ct. Int'l Trade 2001) ...............................................................................26

*Pesquera Mares Australes Ltda. v. United States,* 266 F.3d 1372 (Fed. Cir. 2001) ...............................................................................10

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990)..............12,27

*Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57 (Ct. Intl Trade 1993) ...............................................................................12

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376 (Fed. Cir. 2001)..........................................................12

*Shanghai Taoen Int'l Trading Co., Ltd. v. United States*, 360 F.Supp.2d 1339 (Ct. Int'l Trade 2005)........................................................15

*SKF USA, Inc. v. United States.* 254 F.3d 1022 (Fed. Cir. 2001) ..........................13

*Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077 (Fed. Cir. 2001)........................................................................12,13

*Tung Mung Dev. Co., v. United States*, 354 F.3d 1371 (Fed. Cir. 2004) ...............13

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...................................10,11

*USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487 (1987)...................11

*Venus Wire Industries Pvt. Ltd. v United States,* 417 F.Supp.3d 1289 (Ct. Int'l Trade 2020)...........................................................23

*Wheatland Tube Co. v. United States,* 495 F.3d 1355 (Fed. Cir. 2007).........10,30,31

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ........................................................................12,27

iii

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,* 652 F.3d 1333
(Fed. Cir. 2011) ............................................................................27

*Statutes:*

19 U.S.C. § 1516a (a)(2)(B)(iii) .................................................... 2

19 U.S.C. §1516a(b) ...................................................................... 9

19 U.S.C. §1673d(c)(5) .................................................................. 9

19 U.S.C. §1675(c) .......................................................................31

19 U.S.C. 1677a ...................................................................... 34-36

19 U.S.C. §1677e(a)(2) ..........................................................14,16,28

19 U.S.C. §1677e(b) ...............................................................14,16

19 U.S.C. §1677m(e) .....................................................................14

19 U.S.C. §2411(a)(1) ...................................................................31

19 U.S.C. § 3512(d) ......................................................................27

*Administrative:*

19 CFR §351.401(c) ......................................................................34

Notice of Action and Request for Public Comment Concerning
Proposed Determination of Action Pursuant to Section 301:
China's Acts, Policies and Practices Related to Technology
Transfer, Intellectual Property, and Innovation, 86 *Fed. Reg.*
28710 (June 20, 2018) ...............................................................29

Statement of Administrative Action H.R. Doc. No. 103-316, vol. 1, at
869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4179 ............28

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,*
*From the People's Republic of China: Final Results and Partial*
*Rescission of Review; 2019–2020*, 87 *Fed. Reg.* 1120 (January
10, 2022) ...................................................................................19

## I.  __INTRODUCTION__

This is an appeal from the 2020/21 administrative review of the antidumping order on Antifriction Bearings from the People's Republic of China.  Plaintiff Shanghai Tainai Bearing Co., Ltd. was a mandatory respondent in the review, and Plaintiff C&U Americas, LLC is the importer and CEP entity.  Both Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC,  were parties to the proceeding, having submitted numerous questionnaire responses and comments, as well as case briefs.

The Plaintiffs assert the following errors in the Commerce Department's ("Commerce's") final determinations:

- The Department improperly applied partial adverse inferences to a fully cooperative entity;

- The Department improperly used adverse facts available even though there were no gaps in information;

- The information selected by the Department as partial adverse facts was inappropriate.  Such partial adverse facts were distortive and produced inaccurate results;

- The Department should not have deducted 301 duties from U.S. price. Such duties are not "United States import duties" but rather such duties are special duties akin to antidumping and countervailing duties;

1

- The Department failed to include all monies received by plaintiffs from its customers in payment for goods and improperly decided to "cap" the payments characterized as monies to offset 301 duty at the amount of 301 duties paid; and

- The Department failed to grant an offset for valuable by-products and scrap.

## II.   STATEMENT PURSUANT TO RULE 56.2(c)

### A. Administrative Determination Under Review

This action is brought pursuant to 19 U.S.C. § 1516a (a)(2)(B)(iii) to contest the final results of Commerce's §751 administrative review of *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China* ("Final Results") 88 Fed. Reg. 1359 (January 10, 2023) APPX4316 – 4318.[1] as amplified by the Issues and Decision Memorandum APPX4295 –4315.

In the Final Results, Commerce calculated a margin of 36.03% for plaintiff Tainai.   APPX4316 - 4318.

---

[1] Pursuant to direction of Chambers, the record will be reported by number.  Public documents are in the range APPX1000 to APPX4356 and confidential documents are in the range APPX80000 to APPX86363.

## B. Issues of Law

The Plaintiffs present the following issues of law.  In each instance, Commerce's decision was not based on substantial evidence on the record, and was arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law.  The issues are:

1. **Issue.** Whether the Department's application of partial adverse inferences to a fully cooperative respondent was arbitrary and capricious and an abuse of discretion.

2. **Issue.** Whether the Department should use adverse facts available or neutral facts available to fill any gap in the record.

3. **Issue.** Whether the Department's calculations were factual incorrect and thus was not accurate.

## C. Summary Of Arguments

- The Department cannot take adverse inferences against a fully cooperative entity.  Tainai supplied  all of the information in its possession, and to the extent that any information was not of record, such information was that of third parties. Tainai tried, but was unable, to obtain such information due to the non-cooperation of the third parties.

- If the Department found an absence of evidence from the record, it should have filed the gaps with neutral facts, not adverse facts.

- The Department had all of the information necessary to calculate margins and thus had no gaps to be filed.  Accordingly, to the extent that certain information was  not  provided  by  third  parties,  such  information  was ultimately not needed.  In the absence of missing information, the Department

3

has no gaps to fill.

- The values selected as partial adverse facts were distorted and bore no reasonable relationship to the factors being valued.  This resulted in highly distorted values. The Department's methodology ignored all of the physical characteristics.

- The Department should not have deducted 301 duties from U.S. price.  Such duties are not ordinary duties, but rather are remedial duties akin to Antidumping duties.   By deducting these duties, the Department is imposing remedial duties based on remedial duties.

- All monies received in payment of the goods, whether characterized as 301 duty payments or payments for goods, should have been included in the price for the U.S. goods.   The Department's decision to "cap" these payments is contrary to law.

- The Department failed to grant an offset for valuable by-products and scrap.

### D. Statement Of Facts

The antidumping order on Tapered Roller Bearings from China was published on June 15, 1987.  See *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China*, 52 Fed. Reg. 22667 (June 15, 1987), as amended, *Tapered Roller Bearings from the People's Republic of China; Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order in Accordance With Decision Upon Remand*, 55 Fed. Reg. 6669 (February 26, 1990).   This appeal concerns the 2020/21 administrative review. See  *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 86  Fed. Reg. 41,821 (August 3, 2021). (APPX1054 – 1060)

4

In the segment of the proceeding under appeal, Commerce issued its preliminary results as *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2020–2021,* 87 FR 40792 (July 8, 2022) (APPX4193 – 4196) and related issues and decisions memorandum. (APPX4153 – 4174) Commerce calculated a preliminary rate of 36.03% for Tainai. Commerce's Final Results and final Issue and Decisions Memorandum were issued as set forth in the "Administrative Determination Under Review," *supra* and such results confirmed the 36.03% rate for Tainai.

On August 3, 2021 , pursuant to a request for review filed on June 30, 2021 by Koyo Bearings North America LLC (APPX1039–1042), the Department initiated the Administrative Review underlying this matter. See *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 86 Fed. Reg. 41821 (August 3, 2021). (APPX1054-1060)

During the course of the administrative review, plaintiffs submitted responses to the Department's questionnaires. Plaintiffs fully and completely responded in a timely fashion to all questionnaires and supplemental questionnaires issued by the Department.

On May 10, 2022, in response to a supplemental questionnaire issued by the Department, Tainai provided all of the information that it had been able to obtain

from its unaffiliated suppliers and their response to Tainai's requests for information. (APPX2902 – 3017, APPX84638 - 84953).  Tainai also supplied a copy of its request for information.  (APPX2920, APPX84732)

On July 8, 2022 the Department published the preliminary results for the administrative review.   See *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2020–2021,* 87 FR 40792 (July 8, 2022) Commerce calculated a preliminary rate of 36.03% for Plaintiff Tainai. (APPX4193 - 4196)

As provided in the May 10, 2022 supplemental questionnaire, and as set forth in the attached chart, Tainai obtained some information from these unaffiliated suppliers the portion of business provided by Tainai to these suppliers.  Tainai received a response from 19 suppliers.  (APPX84865 – 84902)  The only supplier that was willing to provide any further information, was coincidentally, a supplier where Tainai supplied more than a minimal amount of the supplier's business.  The chart is as follows:

| Entity | Percentage |
|---|---|
| [Name<br>(APPX84865 – 84866) | % |
| Name<br>(APPX84867 – 84868) | % |
| Name<br>(APPX84869 – 84870) | %  ] |

| | |
|---|---|
| [Name<br>(APPX84871 – 84872) | % |
| Name<br>(APPX84873 – 84874) | % |
| Name<br>(APPX84875 – 84876) | % |
| Name<br>(APPX84877 – 84878) | % |
| Name<br>(APPX84879 – 84880) | % |
| Name<br>(APPX84881 – 84882) | % |
| Name<br>(APPX84883 – 84884) | % |
| Name<br>(APPX84885 – 84886) | % |
| Name<br>(APPX84887 – 84888) | % |
| Name<br>(APPX84889 – 84890) | % |
| Name<br>(APPX84891 – 84892) | % |
| Name<br>(APPX84893 – 84894) | % |
| Name<br>(APPX84895 – 84896) | % |
| Name<br>(APPX84897 – 84898) | % |
| Name<br>(APPX84899 – 84900) | % |
| Name<br>(APPX84901 – 84902) | %] |

The largest of these suppliers, [entity name  ] provided additional data including FOP data.  (APPX84651- 84729).

Non-Confidential

Furthermore, each of these suppliers only supplied a small portion of Tainai's needs.   As set forth in Section D and the supplements thereto, in the case of turned cups and cones, Tainai used [#] suppliers, each of which only supplied a small portion of Tainai's needs.  The single largest supplier, which was related to Tainai, and whose data was included in the FOP data, supplied [ %] of Tainai's needs.  In a similar fashion, for Cages Tainai used [#] suppliers and for rollers [#   ] suppliers. (APPX81895 – 81896)

On August 15, 2023, plaintiffs filed an administrative case brief with the Department of Commerce challenging the preliminary results. (APPX4218 – 4253, APPX86312 – 86347)

On August 23, 2023, the domestic industry filed administrative rebuttal briefs with the Department of Commerce. (APPX4254 – 4269, APPX86348 – 86363)

 On January 4, 2023 the Department issued the final results.  On January 10, 2023,  these results were published in the Federal Register as *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China* ("Final Results") 88 Fed. Reg. 1359   (January 10, 2023). (APPX4316 – 4318) The Department also issued an "Issues and Decisions Memorandum" in connection with the final results. (APPX4295 – 4315)   In the final results the Department found that Tainai had not fully cooperated, and thus decided to take partial adverse inferences to fill perceived gaps in the record.   Specifically, the

Department decided to take partial adverse inferences against Tainai because of the failure of the unaffiliated suppliers to supply certain information and assigned a rate of 36.03% to Tainai based in part "partial" adverse facts.   The rate assigned to Tainai was assigned to all other respondents found to be qualified to receive a separate rate.

The Department found a purported gap where these unaffiliated suppliers failed to provide the requested COP data used in the production of the materials provided to Tainai by them. To fill this gap, the Department elected to use adverse facts and calculated the substitute factors of production by taking the single highest weighted component supplied by an uncooperative unrelated supplier for which a value was purportedly missing and applying in lieu of the reported weight the highest single component weight.

## III.   STANDARD OF REVIEW

The Court will hold unlawful Commerce determinations that are unsupported by substantial evidence on the record or are not otherwise in accordance with law. 19 U.S.C. §1516a(b). To determine whether Commerce's interpretation and application of 19 U.S.C. §1673d(c)(5) is "in accordance with law," the courts review the statute to determine whether "Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984).

If the statute is silent or ambiguous with respect to a specific issue, the U.S. Court of Appeals for the Federal Circuit has held that *Chevron* deference is owed Commerce's statutory interpretations as to appropriate methodology. *Pesquera Mares Australes Ltda. v. United States,* 266 F.3d 1372, 1379 (Fed. Cir. 2001). That analysis entails determining whether Commerce's construction of an ambiguous statute is "permissible." *See Chevron,* 467 U.S. at 843. A "permissible" construction is understood in terms of reasonableness; only reasonable interpretations will be upheld by the Court. *See Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1038 (Fed. Cir. 1996) *('Chevron* requires us to defer to the agency's interpretation of its own statute as long as the interpretation is reasonable."). To determine reasonableness, courts look to the express terms of the statute, the objectives of the statute, and the objectives of the statutory scheme as a whole. *Wheatland Tube Co. v. United States,* 495 F.3d 1355, 1361 (Fed. Cir. 2007).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), *quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938). Furthermore, "substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quotations omitted). Thus, "it is

appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to {that} view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983) *quoting Universal Camera*, 340 U.S. at 488.

Moreover, Commerce's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987). The substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

Commerce also must make its decisions based on a fair and balanced comparison of the data. To do otherwise is arbitrary and capricious. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d at 1562 ("substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.") *See also, Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183, 1192 (Ct. Int'l Trade 2009).

Commerce is required to objectively evaluate all data on the record. Thus, the agency must hold its preferences to the same test as it uses to evaluate respondent's

proffered data. *See, e.g., Dorbest Ltd v. United States*, 462 F. Supp. 2d 1262, 1302 (Ct. Int'l Trade 2006) (holding that Commerce must justify its decisions).

In addition, Congress intended that Commerce calculate dumping margins as accurately as possible and use the best available information. *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013). In *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016), the Court explained that a Commerce determination is "'accurate' if it is correct as a <u>mathematical and factual matter</u>…" (Emphasis added). To achieve this required accuracy, "antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012). *See also, Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57, 64 (Ct. Intl Trade 1993) (".. .the Department has honored one of the fundamental principles underlying the trade statute –accuracy. It is this endeavor for accuracy … that lends respectability to U.S. trade statutes. .").

Moreover, "while various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case when a more accurate methodology is available…." *Thai Pineapple Canning*

12

*Indus. Corp. v. United States*, 273 F.3d 1077, 1085 (Fed. Cir. 2001). Additionally, "to avoid distortions, the Department must consider all relevant factors, including those not present in most antidumping determinations." *Id*.

When substantial evidence is not utilized, such action is tantamount to the use of speculation in making a determination. *See Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial evidence.'" (quoting *Novosteel SA v. United States,* 284 F. 3d 1261, 1276 (Fed. Cir. 2002) (internal quotation marks omitted)).

It is axiomatic that Commerce may not exert its authority in an arbitrary or capricious manner. *See, e.g., Tung Mung Dev. Co., v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004). Commerce's decision will be set aside if it is arbitrary and capricious. *See, e.g., SKF USA, Inc. v. United States.* 254 F.3d 1022, 1028 (Fed. Cir. 2001). "{A} reviewing court must apply both standards {substantial evidence, and arbitrary and capricious or contrary to law}, while  "an agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action." *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974).

IV.   **ARGUMENT:**

   A. **The Department Should Not Take Averse Inferences Against a Fully Cooperative Entity**

There are two related statutory principles which ultimately relate to the question of the appropriateness of the application of adverse facts to a respondent. The first of these is the concept of adverse inferences.   This is provided for in 19 U.S.C. §1677e(b).  The second of these is the nature of facts selected when facts are needed to fill gaps and whether such facts are neutral or adverse. This is provided for in 19 U.S.C. §1677e(a)(2) in conjunction with 19 U.S.C. §1677m(e).  These two concepts, for the convenience of the Department and the parties, are often collapsed into an informal single standard called "Adverse Facts Available" and referred to by the collective term "AFA".  This is not legally correct.  Each of these concepts are separate and distinct and are subject to separate analysis. As noted in *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)  "{t}he statute has two distinct parts respectively addressing two distinct circumstances under which Commerce has received less than the full and complete facts needed to make a determination."

Accordingly, if the Department finds that adverse inferences should not be taken, then any facts available selected should be neutral.   If the Department does not find a gap in facts, the Department should not substitute adverse facts for facts

of record.

During an administrative review the Department issues questionnaires and supplemental questionnaires to entities selected as mandatory respondents.   It is every party's obligation to use its best efforts to respond to the Department questionnaires. The Courts have stated:

> The statute does not provide an express definition of "the best of its ability," although the Federal Circuit has determined that "the statutory mandate that a respondent act to 'the best of its ability' requires the respondent to do the maximum it is able to do." *Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1382 (Fed.Cir.2003). To meet this standard, Commerce "needs to articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance...." *Mannesmannrohen-Werke AG v. United States,* 23 CIT 826, 839, 77 F.Supp.2d 1302, 1313-14 (1999). *Shanghai Taoen Int'l Trading Co., Ltd. v. United States*, 360 F.Supp.2d 1339 (Ct. Int'l Trade 2005) at 1344.

It is axiomatic that the Department should not apply adverse inferences to a fully cooperative entity.  This does not mean that the Department cannot fill in gaps of missing information.  It simply means that the Department cannot penalize a fully cooperative entity. To the extent that necessary information is not available, the missing information should be selected from neutral facts, not adverse facts.

In order for an entity to be found not to be cooperative, it requires more than a showing of an error or a mistake.   *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003), clearly outlines the requirements for such a finding.  In the administrative action underlying the *Nippon Steel*  decision, the plaintiff had failed

to provide certain conversion data in its possession in a timely manner.   The issue

was whether such failure justified the taking of adverse inferences.  The court found

that there were two distinct points to be considered by the agency.  The U.S. Court

of Appeals for the Federal Circuit stated:

> The statute has two distinct parts respectively addressing two distinct
> circumstances under which Commerce has received less than the full
> and complete facts needed to make a determination. Under subsection
> (a), if a respondent "fails to provide [requested] information by the
> deadlines for submission," Commerce shall fill in the gaps with "facts
> otherwise available." The focus of subsection (a) is respondent's failure
> to provide information. The reason for the failure is of no moment. The
> mere failure of a respondent to furnish requested information — for any
> reason — requires Commerce to resort to other sources of information
> to complete the factual record on which it makes its determination. As
> a separate matter, subsection (b) permits Commerce to "use an
> inference that is adverse to the interests of {a respondent} in selecting
> from among the facts otherwise available," only if Commerce makes
> the separate determination that the respondent "has failed to cooperate
> by not acting to the best of its ability to comply." The focus of
> subsection (b) is respondent's failure to cooperate to the best of its
> ability, not its failure to provide requested information.
>
> The legislative history found in the Statement of Administrative Action
> ("SAA") accompanying the Uruguay Round Agreements Act, Pub.L.
> No. 103-465, 108 Stat. 4809 (1994) ("URAA"), confirms the distinction
> between the two sections. . . .  In adopting the URAA, Congress
> changed the terminology and noted:
>
>> New section [1677e(a)] requires Commerce and the
>> Commission to make determinations on the basis of facts
>> available where the requested information is missing from the
>> record or cannot be used because, for example, it has not been
>> provided, it was provided late, or Commerce could not verify
>> the information.
>> * * *
>> [N]ew section [1677e(b)] permits Commerce and the

Commission to draw an adverse inference where a party has not cooperated in a proceeding. A party is uncooperative if it has not acted to the best of its ability to comply with requests for necessary information. Where a party has not cooperated, Commerce and the Commission may employ adverse inferences about the information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.

SAA at 869-70, reprinted in 1994 U.S.C.C.A.N. 4040, 4198-99.  * * * Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information. Compliance with the "best of its ability" standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping. It assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries: (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.
*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) at 1380 – 1383.

The respondents in the administrative proceeding underlying *Nippon Steel*, were ultimately found to have the records in their possession, and thus, as the plaintiff had control of the records, the failure to provide them to the Department was a failure to use best efforts.  The test enumerated clearly states that if a party

17

does not have or maintain a particular record, the party cannot be found to have failed to use best efforts for failing to provide such record.  As discussed below, Tainai's conduct, in contrast, met all of the requirements for best efforts and cooperation.

1. *Tainai was fully cooperative and answered all of the Department Questionnaires*

The first prerequisite for a taking of adverse inferences is a finding that a party did not use its "best efforts" in responding to the Department.   While the term "best efforts" is somewhat nebulous, under even the most extreme definition of "best efforts" Tainai used its best efforts and was fully cooperative.   As set forth above, best efforts include:

- Reasonable steps to maintain full and complete records (*Nippon Steel* at 1383) – Tainai did this.   Tainai was able to provide whatever information the Department needed from its own records at a high level of detail as required by the Department.   The Department has not found or alleged that Tainai failed to provide any records in Tainai's possession.
- Have familiarity with records in its possession, custody or control (*Id.*) – Tainai did this.  Tainai knows the records in its possession, custody and control and provided those documents requested by the Department.  As with the prior step, the key is that the documents were not provided were not records in Tainai's possession, custody or control.  The Department has not found or alleged that Tainai was not familiar with its records.
- Conduct prompt, careful and comprehensive investigations of all relevant records to the full extent of the importers ability to do so (*Id.*) – Tainai did this.   Tainai conducted a complete and full examination of its records.  As the above, the Department has not alleged or found that Tainai did not conduct a complete and full examination of its records.

18

Critically, Tainai advised the Department early in the process that certain unrelated suppliers provided key input. (APPX80258 - 80260) Tainai was aware of the potential consequences of failing to obtain this cooperation. Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results and Partial Rescission of Review; 2019–2020, 87 Fed. Reg. 1120 (January 10, 2022) in which the Department assigned a rate of 538.79% to Tainai based on the taking of adverse inferences and the selection of partial adverse facts. Tainai continued to seek cooperation from these third-party entities. Critically the Department has not claimed that Tainai itself failed to cooperate, and had it done so it would have found that Tainai was not part of the China-Wide entity. The Department has a consistent practice to do so. See, i.e. *Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) at 1370-1371, *Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F.3d 1339 (Fed. Cir. 2015) at 1353, In non-market economy cases, such as those involving China, if a party fails to cooperate, that party is found to be ineligible for a separate rate and receive the most recently calculated China-wide rate. While the China-Wide rate is ordinarily based on adverse inferences and is derived through an application of adverse facts, the Department of Commerce maintains the legal fiction that the assignment of the China-Wide rate is not an assignment of a rate based on the taking of adverse inferences and calculated using adverse facts available. In this matter the

19

Department found that Tainai was entitled to a Separate Rate and was not part of the China-Wide entity.  The Department necessarily found that Tainai was cooperative.

2. *Tainai attempted to obtain information from its third-party suppliers, but was  unable to obtain cooperation*

The inability of a respondent to obtain information from unrelated third-parties is neither new nor unique.  In today's complex business world, producers frequently obtain materials and services from third-parties.  In fact, as is readily apparent from the identity of Tainai's customers (for example, [names of customers.] APPX81035), Tainai's business is supplying materials such as Tapered Roller Bearings to its customers.

While the Department has refined this practice to require that parties obtain information from unrelated third-parties where the respondent has the power induce cooperation, it does not require provision of this data no matter the degree of power.

In this case, its quite clear that Tainai does not have market power to obtain cooperation.   This is demonstrated by three different pieces of evidence:

1.     Tainai is not large.    While Tainai is the largest exporter in this particular review (and was thus selected as the Mandatory Respondent) it is not "large".  It is simply the largest in a selected pool – those entities which are being reviewed.  Compare, for example, the total sales of Timken Romania in 2019 was 442,074,574 Romanian Leu  ($99,450,000 USD) as reflected in the financial statement provide in the surrogate value submission (APPX2531) compares to the

[value        ] of operating income for Tainai. (APPX80600).  Timken Romania is

more than 4 times larger than Tainai.    And Timken Romania is not large.

APPX2585 - 2586.  Finally, the Court should contrast the comparative sizes of

Tainai and another Chinese producer listed in the CBP data.   Such data readily

demonstrates the small size of Tainai and its lack of market power.(APPX80084)

    2.     Tainai uses many suppliers.  Tainai does not concentrate its purchases

with a single source of supply.  Rather Tainai uses a broad range of suppliers each

of which supplies on a small portion of Tainai's needs.

    3.  Tainai's Business is a small portion of its supplier's business.  Tainai is an

unimportant customer for many of its unaffiliated suppliers.  The chart is as follows:

| Entity | Percentage |
|---|---|
| [Name<br>(APPX84865 – 84866) | % |
| Name<br>(APPX84867 – 84868) | % |
| Name<br>(APPX84869 – 84870) | % |
| Name<br>(APPX84871 – 84872) | % |
| Name<br>(APPX84873 – 84874) | % |
| Name<br>(APPX84875 – 84876) | % |
| Name<br>(APPX84877 – 84878) | % |
| Name<br>(APPX84879 – 84880) | % |

Non-Confidential

| Name (APPX84881 – 84882) | % |
|---|---|
| Name (APPX84883 – 84884) | % |
| Name (APPX84885 – 84886) | % |
| Name (APPX84887 – 84888) | % |
| Name (APPX84889 – 84890) | % |
| name (APPX84891 – 84892) | % |
| name (APPX84893 – 84894) | % |
| name (APPX84895 – 84896) | % |
| name (APPX84897 – 84898) | % |
| name (APPX84899 – 84900) | % |
| Name (APPX84901 – 84902) | %] |

Tainai does not have the market power to obtain this information.    Further, Tainai used [#] suppliers of turned cups and cones. The related suppliers provided [%] of the turned cups and cones.   Thus the [#] unrelated suppliers provided [percent supplied] of the turned cups and cones, or an average of [        %] each. (APPX82718)  The significant number of suppliers, and the small percentages of supplied by each, establishes that Tainai does not have the market power to compel these entities to respond.  Tainai asked these unrelated suppliers to cooperate and these suppliers said no.   The Court has held that Commerce must consider the

evidence showing why the efforts for cooperation failed and whether the respondent

had the practical ability to force cooperation.   The decision in *Venus Wire Industries*

*Pvt. Ltd. v United States,* 417 F.Supp.3d 1289 (Ct. Int'l Trade 2020) is instructive.

In *Venus*  the issue was whether the e-mails from Venus to its  unrelated suppliers

served as  a sufficiently strong inducement to  cooperate.  In rejecting the application

of AFA, the Court stated in relevant part:

> {W}hile *Mueller* recognizes that an unwillingness to export goods
> produced by an uncooperative supplier "would potentially induce [the
> supplier] to cooperate," the appellate court also stated that "if the
> [respondent] has no control over the noncooperating suppliers, a
> **resulting adverse inference is potentially unfair to the
> [respondent]**." The concept of "control," as discussed in *Mueller*, does
> not require actual control, but, instead, it requires Commerce to
> consider record evidence concerning the **practical ability of a
> respondent to induce the supplier's cooperation**.
>
> Here, Commerce did not adequately consider evidence tending to show
> that Venus's efforts to induce cooperation failed, at least in part,
> because of circumstances beyond Venus's control; to wit, the suppliers'
> own concerns that providing the cost information did not serve the
> suppliers' respective interests. Moreover, Commerce failed to point to
> any evidence indicating that Venus could induce its unaffiliated
> suppliers' cooperation. Instead, Commerce appeared to assume that
> Venus had leverage over its unaffiliated suppliers and simply failed to
> properly apply it. Commerce's reasoning is inconsistent with *Mueller*,
> which recognizes the possibility of inducing cooperation, but not the
> certainty.
> *Venus Wire Industries Pvt. Ltd. v United States,* 417 F.Supp.3d 1289
> (Ct. Int'l Trade 2020) at 1307-1308.

In sum Tainai tried to obtain the information from the unrelated third-parties,

but was unable to do so.  From most of its suppliers it received a partial response

and some information, including the portion of the business provided by Tainai, but these suppliers were unwilling to provide COP data. Not only is there no evidence that Tainai had any leverage over its unaffiliated suppliers to induce cooperation, the evidence shows an absence of leverage by Tainai over these unaffiliated suppliers. Tainai had multiple suppliers, all of which only supplied a small portion of Tainai's needs. Tainai was also an insignificant customer for many of these suppliers. Simply put, Tainai was not a significant enough customer of any of these entities to assert any power over these entities. Tainai sought the cooperation, as directed by the Department, but ultimately failed. Tainai's efforts to obtain this information constituted best efforts by Tainai, and Tainai should not be punished by the taking of adverse inferences against Tainai because of this failure of the third party.

3. *Court precedent does not require a party to provide information not in its possession and which it cannot reasonably obtain.*

The Courts have long held that a party can only be required to provide the information that it actually has in its possession. In examining the "best information available" rules (the predecessor to Adverse Inferences and the Adverse Facts Available provisions) the Court in *Olympic Adhesives, Inc. v. United States,* 899 F. 2d 1565 (Fed. Cir. 1990) stated:

> But we agree with Olympic that this "incompleteness" or "deficiency" is not attributable to any deficiency in the answers provided by Extraco. The ITA may not properly conclude that resort to the best information rule is justified in circumstances where a questionnaire is sent and completely answered, just because the ITA concludes that the answers

24

do not definitely resolve the overall issue presented. Although the ITA may properly request additional supplemental information, if needed, to fully resolve the issue, section 1677e(b) clearly requires noncompliance with an information request before resort to the best information rule is justified, whether due to refusal or mere inability. See, e.g., *Daewoo Elec. Co. v. United States*, 712 F.Supp. 931, 944 (Ct. Int'l Trade 1989). The ITA suggests that Extraco should have made efforts apart from the questionnaire to rebut the allegations of fictitious sales. **However, section 1677e(b) does not place that obligation on the submitter. To avoid the threat of § 1677e(b), a submitter need only provide complete answers to the questions presented in an information request.**
*Olympic Adhesives, Inc* at 1574.

Subsequent Court decisions have further expanded upon *Olympic* and confirmed that the Department does not have unlimited discretion and cannot take adverse inferences, and thus cannot resort to facts available, where the information does not exist.   In *Peer Bearing Co. v. United States*, 182 F.Supp.2d 1285 (Ct. Int'l Trade 2001) the Court stated:

Consequently, Commerce enjoys very broad, although not unlimited, discretion with regard to the propriety of its use of BIA. See generally, *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565 (Fed. Cir.1990) (acknowledging Commerce's broad discretion with regard to the use of facts available but pointing out that Commerce's resort to facts available is an abuse of discretion where the information Commerce requests does not and could not exist).
*Peer Bearing* at 1295.

See also, *Ferrostaal Metals Gmbh v. United States*, 518 F. Supp. 3d 1357 (Ct. Int'l Trade 2021) at 1374.

In the case at bar, there is no allegation that the information not provided by

Tainai was information in the possession of Tainai.   The Department's allegation is that this was information of third parties not obtained by Tainai.   Simply put, at least with respect to Tainai, the information requested by the Department does not and could not exist – at least with respect to Tainai

### B. The Department Should Not Value Inputs of Finished Components with Partial Adverse Facts

The Department valued a number of the inputs for which it took partial adverse inferences with surrogate value information for finished goods.  .  As such, the underlying material inputs that went into the production of these components was not necessary and would not be used.  As Tainai reported the weights of the completed components, there was no missing information, as while the third parties did not provide to Tainai bills of materials and factors of production, the selected surrogate values made the use of such data not provided by the third parties unnecessary.  This is not unusual.  In calculating factors of production the data required goes to the level of the input, not all of the factors of production which go into the production of the input.  For example, it the input is steel bar, the input is valued with a surrogate value for steel bar.  A party is not required, or even expected, to provide the inputs that go into the material, such as Iron Ore, alloying materials, labor, and the like that go into the production of the steel bar.  In this case, the "inputs" were the components, not the material that went into the components.    In

the absence of missing information, the Department has no gaps to fill, and to the extent that information was "missing" it was not relevant.

### C. **The Factors of Production Selected by the Department as Partial Adverse Facts were Highly Distorted**

The Department selected as partial adverse facts information factors of production which were highly distorted and bore no reasonable relationship to the factors being valued. This resulted in highly distorted values. A critical factor to be taken into account by the Department in calculating rates is that of accuracy. (See *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995), *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185 (Fed. Cir. 1990)) In the recent *Diamond Sawblades Manufacturers' Coalition v. United States,* 986 F.3d 1351 (Fed. Cir. 2021) the Court stated:

> We have explained that "{a}n overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible." *Yangzhou Bestpak Gifts & Crafts Co. v. United States,* 716 F.3d 1370, 1379 (Fed. Cir. 2013) (citing *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed. Cir. 1990)); *see also Mid Continent Steel,* 941 F.3d at 542. More particularly, we have often focused, when applying § 1677e(a), on the subsection's role as a command to Commerce "to fill a gap in the record" when information is missing or compromised. *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,* 652 F.3d 1333, 1348 (Fed. Cir. 2011); *see also Nippon Steel,* 337 F.3d at 1381. To the extent that information supplied is reliable, *i.e.,* not in fact tainted by its supplier's conduct, "gap" seems an inapt characterization. And the authoritative Statement of Administrative Action, *see* 19 U.S.C. § 3512(d), states that subsection 1677e(a) pertains to situations "where requested information is missing from the record or cannot be used because, for example, it has not been provided, it was provided late, or Commerce could not verify the

information," and when needed information is missing, Commerce "must make [its] determinations based on all evidence of record, weighing the record evidence to determine that which is most probative of the issue under consideration," H.R. Doc. No. 103-316, vol. 1, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4179. That explanation, on its own, suggests an information-specific consideration of probativeness rather than any blanket disregard of all information supplied by a person whenever some of the information supplied by that person is unreliable

*Diamond Sawblades* at 1365

This important goal calculating dumping margins as accurately as possible was not met in the case.   In the final results, the Department made a significant error and it erred in the selection of the substitute factors of production and failed to consider any physical characteristics in selecting such substitute factors of production.

In making its selection, the Department ignored all of the physical properties, dimensional measures and CONNUM factors in assigning substitute factors of production.   Rather than taking into account any of these physical characteristics, the Department applied a metaphorical meat axe to the data, arbitrarily selecting factors without any consideration of the properties of the components needing valuation and the final product.

This is readily illustrated by the following:

Product code [Product Code] is assigned CONNUM [CONNUM]       This is a Tapered Roller Bearing Assembly with an outer diameter of [#] and an inner diameter of [#] and a weight of [#] KG.  The cage FOP was [#] (APPX86159) the

substitute cage FOP assigned by the Department was [#] (APPX85959)

The selected cage input was nearly a multiple of [number] of the actual input and represented nearly [fact].   This defies commercial reality.

### D. The Department Should Not have Deducted 301 Duties from the U.S. Price

In the determination, the Department adjusted the U.S. price by deducting from this price the amount of the Section 301 duties paid by Tainai's U.S. affiliate at the time of importation.   Such Section 301 duties were imposed by the United States, pursuant to International Agreements, to address certain conduct by the People's Republic of China and to force China to modify its conduct. (*See*, Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301:   China's Acts, Policies and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 86 *Fed. Reg.* 28710 (June 20, 2018).   The notice expressly states that the purpose is "to obtain elimination of China's harmful acts, policies and practices". ) These 301 duties are not ordinary duties, and are more akin to remedial Antidumping duties and thus should not be deducted from U.S. price.

It is well established that Antidumping Duties are not imposed on other trade corrective duties.   If Antidumping duties were imposed on other trade duties, trade corrective duties would be imposed on top of other corrective duties, which would create a cascade creating even larger corrective duties.  The Department avoids doing

this as a matter of policy, not as a matter of law.  In calculating the amount of antidumping duties, the Department does not deduct either countervailing or antidumping duties from the U.S. price as to do otherwise would result in the imposition of antidumping duties based on duties.  This is a statutory construction consistently applied by the Department.  Tainai submits that the term "United States import duties" referenced in Section 772(c)(2)(A) refers to "ordinary customs duties" and not duties imposed under Section 301.

The Court decision in *Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007) is instructive.   In *Wheatland*  the court laid out three criteria for determining whether a duty is a remedial duty or an ordinary duty.   The *Wheatland* criteria are:

Whether other duties are remedial duties that provide relief from the adverse effects of imports. (*Wheatland* at 1362)

 Whether other duties are imposed as a result of a finding of injury or threat to a U.S. industry. (*Wheatland* at 1362)

Whether other duties provide only temporary relief. (*Wheatland* at 1362)

The 301 duties meet each of these *Wheatland* tests. The 301 duties were imposed in order to provide relief from unfair competition in the form of the theft of intellectual property. These duties were expressly intended to force the Government of China to increase such protections and thus provide for fair trade.

30

The 301 duties were the result of an express finding of threat to the U.S. as a result of the conduct in question. 19 U.S.C. §2411(a)(1) requires the U.S. to take action if certain conditions are met.  Such 301 duties provide only temporary relief. As discussed above, 301 duties terminate once the conduct sought to be remedied no longer exists, and such duties are subject to a 4 year review cycle to determine whether they should remain in place. This is akin to the antidumping duty law which provides for a five-year sunset review process wherein the order terminates in the event that the underlying conditions no longer exist. (See 19 U.S.C. §1675(c)).

The U.S. Court of Appeals for the Federal Circuit in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023) recently considered whether duties imposed under Section 232 of the Trade Expansion Act of 1963 were remedial duties.   While 232 and 301 duties are imposed for different purposes, and thus *Borusan* is of limited probative value,  and while the Court's analysis was in part fact based, the critical fact is that the Borusan Court did not overturn *Wheatland*.

In sum, it is clear that Section 301 duties are special duties, not ordinary duties.  These Section 301 duties are focused on resolving certain conduct by China and Chinese exporters, just as Antidumping duties are focused on resolving certain other conduct by China and Chinese exporters.  In contrast, ordinary duties are not focused on resolving specific conduct, but rather are applied across the board to all

trading partners.  As such, deducting Section 301 duties in calculating U.S. price is distortive and such deductions should not be taken.

### E. The Department Should Not Have Capped the Addition to the U.S. Price for 301 Duties

There is a second issue involving 301 duties.    This issue is separate and distinct from the applicability of the 301 duties.  The price paid by the customer consisted of either a unit price, which price was set by the seller and agreed to by the customer or a unit price which was bifurcated into a unit price and an additional charge representing additional revenue to offset the added costs of the seller resulting from the imposition of the Section 301 duties. (APPX82056 - 82057) Thus, for certain sales an additional amount was reported as additional compensation intended to off-set the additional expense, including the duty,  incurred for the 301 duties.   It was not a pass-through, it was a fixed amount.

There is no dispute as to whether or not these payments should be added to the price.    All parties agree that such payments should be added to the price as additional revenue.  If these payments were not included, it would result in double-counting – first the deduction of duties from the U.S. price, and then lowering the U.S. price by lowering the amount paid.  The dispute is related to the amount of such additional revenue. Rather than applying the entire amount received from the Customers as part of the price paid or payable, the Department limited those

payments denominated as "additional revenue for 301" to the amount of Section 301 duties paid on the goods.  Thus, for example, if the amount of the 301 duty paid on a particular entry was $0.30 and the invoice reported a tariff charge of $0.32, the Department would reduce the amount paid for the goods by $0.02.  There is no dispute that $0.30 should be included in the price paid or payable. This was a legal error.

Whether or not these payments were collected because of the Section 301 duties, these payments ultimately represented revenue received by Tainai on a specific sale. Even if the Section 301 duties were ultimately refunded, the additional revenue collected by Tainai would be retained and would not be refunded to the customer. See also Floral Trade Council v. United States, 41 F.Supp.2d 319 (Ct. Int'l Trade 1999) in which surcharges to cover the cost of certain duties was found to be part of the price paid or payable.

In evaluating the inappropriate nature of this cap, it is critical to examine the antidumping duty statute and implementing regulations.   The statute and implementing regulations are clear.  Tainai submits that the antidumping duty law contemplates the use of a price which is the money received from the customer and for which only limited adjustments are made.   The regulation states:

> Use of price net of price adjustments.  In calculating export price, constructed export price, and normal value (where normal value is based on price), the Secretary normally will use a price that is net of price adjustments, as defined in § 351.102(b), that are reasonably

attributable to the subject merchandise or the foreign like product (whichever is applicable). The Secretary will not accept a price adjustment that is made after the time of sale unless the interested party demonstrates, to the satisfaction of the Secretary, its entitlement to such an adjustment.
19 CFR §351.401(c)

This regulation also reflects the statute.   The statute, at 19 U.S.C. §1677(a)

expressly defines the two types of prices:

(a)Export price
The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c).

(b)Constructed export price
The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d).

In this case, as Tainai only sold its product through its U.S. affiliate, all of the

transactions used a constructed export price.   The deductions and additions from

such price are also detailed.   The statute states:

(c)Adjustments for export price and constructed export price
     The price used to establish export price and constructed export price shall be—
(1)increased by—
  (A) when not included in such price, the cost of all containers and
        coverings and all other costs, charges, and expenses incident to

placing the subject merchandise in condition packed ready for shipment to the United States,

(B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States, and

(C) the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to offset an export subsidy, and

(2) reduced by—

(A) except as provided in paragraph (1)(C), the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States, and

(B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title.

(d) Additional adjustments to constructed export price

For purposes of this section, the price used to establish constructed export price shall also be reduced by—

(1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—

(A) commissions for selling the subject merchandise in the United States;

(B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;

(C) any selling expenses that the seller pays on behalf of the purchaser; and

(D) any selling expenses not deducted under subparagraph (A), (B), or (C);

(2) the cost of any further manufacture or assembly (including additional material and labor), except in circumstances described in subsection (e); and

(3) the profit allocated to the expenses described in paragraphs (1) and

35

(2)
19 U.S.C. 1677a

The statute clearly lays out the limited circumstances where the price can be increased or decreased. In this case, the question is whether the price can be reduced by the difference between the duty paid and the portion of the price attributed to the duty paid. The statute does not provide for such reduction. The statute makes it clear that the price can only be reduced by:

•    Additional costs and duties attendant to bringing the subject merchandise to the United States.  This is already present in the calculation for Tainai for items such as Customs Duties.  It does not, however, include the difference between the 301 duties and the amount denominated as additional monies collected.

•    Export taxes imposed on the exportation of goods.  This does not apply to the issue at bar.

As discussed above, the statute clearly provides that the price is the total sum received.  In the case of Tainai, this price includes both the bearing price and the additional amounts collected to compensate for duties.  This is akin to a "material surcharge" which is universally accepted as part of the price.

This is revenue received and should be treated as such.  There is no legal basis to distinguish between these payments and other payments made for the goods. None of the deductions set forth in the statute apply.  In sum, the Department had no

legal authority to "cap" these payments and such cap cannot stand.

### F. The Department Should Have Granted a By-Product Offset

The Department did not grant a by-product offset.  This was incorrect.  Tainai provided the sales information for the scrap that it sold.  However, due to the record maintained in the ordinary course of business, the quantity of scrap produced is not directly recorded.   As such, Tainai explained, in detail, how it allocated the scrap that it sold to the product that it produced. (APPX81735 – 81738, APPX81945) Critically, the quantity of scrap produced is the same as the quantity of scrap sold as Tainai would have no business purpose for retaining scrap.  There is no evidence of record, for example, that Tainai purchased and resold steel scrap, and in fact, the scrap produced and sold is a natural consequence of the production process.    The failure to provide a by-product offset, after such by-product has been sustained by the ordinary business records of the company, results in an artificial increase in the margin and results in a margin which is not accurately calculated.

## V.   **CONCLUSION**

Plaintiffs respectfully request that this Court grant their motion for Judgment on the Agency Record and remand this case to Commerce with instructions

consistent with the points set forth in this memorandum.  Specifically, the Court should find:

That Tainai was fully cooperative and fully answered all of the Department's questionnaires to the extent that it had the information in its possession;

That Tainai attempted to obtain information from its third-party suppliers, but notwithstanding its best efforts was unable to obtain cooperation.   Tainai did not have sufficient market power to force the unrelated suppliers to cooperate.

That the factors of product selected by the Department as partial adverse facts were highly distorted and the Department should have selected neutral facts to fill any gaps.

That the Department should not have deducted 301 duties from the U.S. price as such duties are not ordinary duties, but rather are akin to antidumping duties.

That the Department should not have capped the amount of revenue received as additional payment at the amount of the 301 duty paid.  The statute only provides limited deductions from the U.S. price, and the proposed cap is thus contrary to law.

That the Department should have granted a by-product offset.

That the Department should have granted a by-product offset.

Based on the foregoing, this Court should remand the determination to the U.S. Department of Commerce with instructions that it recalculate the margin for Tainai to correct the errors in the determination.

Respectfully submitted,

/s/ David Craven
David Craven

David J. Craven
Craven Trade Law LLC
3744 N Ashland Avenue
Chicago, IL 60613
(773)709-8506
David.craven@tradelaw.com

Counsel to Shanghai Tainai Bearing Co., Ltd.
and C&U Americas, LLC

Dated: July 13, 2023