IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:   THE HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |  |
|---|---|---|
| SHANGHAI TAINAI BEARING CO., LTD. and C&U AMERICAS, LLC, | ) ) ) | **PUBLIC VERSION** |
| Plaintiffs, | ) ) | |
| and | ) ) | Court No. 23-00020 |
| ZHEJIANG JINGLI BEARING TECHNOLOGY CO., LTD., | ) ) ) | |
| Plaintiff-Intervenor, | ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant
  Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

BENJAMIN JUVELIER
Attorney
Office of the Chief
Counsel for Trade Enforcement
  & Compliance
U.S. Department of Commerce

GEOFFREY M. LONG
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington D.C.  20044
Tel:  (202) 307-0159
E-mail:  Geoffrey.M.Long@usdoj.gov

September 21, 2023                        Attorneys for the United States

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

STATEMENT PURSUANT TO RULE 56.2 ........................................................................ 2

    I.      Administrative Determination Under Review ........................................................ 2

    II.     Issues Presented For Review ................................................................................. 2

STATEMENT OF FACTS .................................................................................................... 3

    I.      Commerce's Administrative Review ...................................................................... 3

    II.     Commerce's Preliminary Results ........................................................................... 5

    III.    Commerce's Final Results ...................................................................................... 6

SUMMARY OF THE ARGUMENT ..................................................................................... 7

ARGUMENT ......................................................................................................................... 8

    I.      Standard Of Review ................................................................................................ 8

    II.     Commerce's Use Of Partial Facts Available With An Adverse
            Inference Is Supported By Substantial Evidence And In
            Accordance With Law ......................................................................................... 10

         A.     Legal Framework ......................................................................................... 10

         B.     Both Tainai And Its Unaffiliated Suppliers Failed To
                Cooperate To The Best Of Their Ability ..................................................... 11

              1.     Plaintiffs Concede That Tainai's Unaffiliated
                    Suppliers Are Interested Parties, And Did Not
                    Cooperate ........................................................................................... 11

              2.     Commerce Found Tainai To Have Been
                    Uncooperative ................................................................................... 12

              3.     Commerce's Finding Of Tainai's Noncooperation Is
                    Supported By Substantial Evidence ................................................... 13

              4.     Commerce's Determination To Fill The Gap In The
                    Record With Tainai's Own Data As An Adverse
                    Inference Is Supported By Substantial Evidence
                    And In Accordance With Law ............................................................ 21

III.     Commerce's Deduction Of Section 301 Duties Is In Accordance
         With Law And Supported By Substantial Evidence.............................................23

IV.      Commerce Reasonably Capped Section 301 Duty Payments................................32

V.       Substantial Evidence Supports Commerce's Decision To Not
         Apply A Byproduct Offset......................................................................................36

CONCLUSION..................................................................................................................38

# **TABLE OF AUTHORITIES**

## **Cases**

*Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F.3d 1339 (Fed. Cir. 2015) ....... 13

*Am. Tubular Prod., LLC v. United States*, 847 F.3d 1354 (Fed. Cir. 2017) .......................... 37, 38

*An Giang Fisheries*, 287 F. Supp. 3d 1361 (Ct. Int'l. Trade 2018) .............................. 18

*APEX Exports v. United States*, 777 F.3d 1373 (Fed. Cir. 2015) ..................................... 24, 25, 32

*Arch Chems., Inc. v. United States*, 33 C.I.T. 954 (2009) ...................................... 36, 37

*Assan Aluminyum Sanayi v. Ticaret A.S.*, 624 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) ............. 35

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
 494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ...................................................... 30, 32

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
 63 F.4th 25 (Fed. Cir. 2023) ................................................................. passim

*Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*,
 701 F.3d 1367 (Fed. Cir. 2012) ................................................................ 13

*Cleo Inc. v. United States*, 501 F.3d 1291 (Fed. Cir. 2007) ............................................ 9

*Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197 (1938) ..................................... 8, 22

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ....................................... 9

*Diamond Sawblades Manuf. Coal. v. United States*, 986 F.3d 1351 (Fed. Cir. 2021) ........... 21, 22

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) ................................ 9

*Fusong Jinlong Wooden Grp. Co., Ltd. v. United States*,
 617 F. Supp. 3d 1221 (Ct. Int'l Trade 2022) ........................................... 15

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ...................... 9

*Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213 (Ct. Int'l Trade 1998) ...................... 25

*INS v. Elias-Zacarias*, 502 U.S. 478 (1992) ............................................ 9

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015) ................................. 9

*Juancheng Kangtai Chem. Co. v. United States*, No. 14-56,
 2015 WL 4999467 (Ct. Int'l Trade Aug. 21, 2015) .................................... 37

*Mueller Comercial De Mexico, S. de R.L. De C.V. v. United States*,
753 F.3d 1227 (Fed. Cir. 2014) .................................................................... 14, 18, 22

*Nan Ya Plastics Corp., Ltd. v. United States*, 810 F. 3d 1333 (Fed. Circ. 2016) .................. 21, 22

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ............................. 10, 11, 14

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ........................................... 9

*PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751 (Fed. Cir. 2012) ............................... 9

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) .............................................................. 9

*Shanghai Tainai Bearing Co. Ltd. v. United States*, No. 22-00038,
2023 WL 5974083 (Ct. Int'l Trade Sept. 14, 2023) ......................................................... passim

*Tianjin Magnesium Int'l Co. v. United States*, 844 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ...... 11

*Venus Wire Indus. Pvt. Ltd. v. United States*, 471 F. Supp. 3d 1289 (Ct. Int'l Trade 2020) ........ 17

*Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007) ................................ passim

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*,
520 F. Supp. 3d 1314 (Ct. Int'l Trade 2021) ............................................................ 5

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, No. 21-2205,
2022 WL 4391436 (Fed. Cir. Sept. 23, 2022) ............................................................ 5

*Xiping Opeck Food Co.*, 222 F. Supp. 3d 1141 (Ct. Int'l Trade 2017) ...................................... 18

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ................................................................................... 8

19 U.S.C. § 1675(c) ............................................................................................ 29

19 U.S.C. § 1675(c)(1) ........................................................................................ 30

19 U.S.C. § 1675(d)(2) ........................................................................................ 30

19 U.S.C. § 1677(18)(A) ...................................................................................... 36

19 U.S.C. § 1677(9) ............................................................................................ 11

19 U.S.C. § 1677(9)(A) ........................................................................................ 7

19 U.S.C. § 1677a(c)(2)(A) ................................................................................. 8, 24

19 U.S.C. § 1677b(a)(1)(A)-(C) .................................................................................... 36

19 U.S.C. § 1677e(a)(1)-(2) ........................................................................................ 10

19 U.S.C. § 1677e(b) ................................................................................................... 10

19 U.S.C. § 1677e(b)(1) .............................................................................................. 11

19 U.S.C. § 2251 ......................................................................................................... 25

19 U.S.C. § 2411 ......................................................................................................... 27

19 U.S.C. § 2411(a)(1) ................................................................................................ 27

19 U.S.C. § 2411(a)(1) ................................................................................................ 31

19 U.S.C. § 2411(b) .................................................................................................... 31

19 U.S.C. § 2417(a)(1) ................................................................................................ 30

19 U.S.C. § 2417(c) ..................................................................................................... 30

## **Regulations**

19 C.F.R. § 351.102(b)(38) .................................................................................... 33, 35

19 C.F.R. § 351.401(b)(1)-(2) ................................................................................ 37, 38

19 C.F.R. § 351.401(c) ................................................................................................ 33

## **Federal Register Notices**

*Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39007 (Executive Office of the President Aug. 17, 2017) ............................................................................................................................ 27

*Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, finished or Unfinished, from the People's Republic of China*, 52 Fed. Reg. 22667 (Dep't of Commerce June 15, 1987) ................................................................................................................................................ 3

*Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany*, 82 Fed. Reg. 16360 (Dep't. of Commerce April 4, 2017) ......................................................................................... 34

*Certain Quartz Surface Products from India*, 85 Fed. Reg. 25391 (Dep't of Commerce May 1, 2020) ............................................................................................................................ 34

*Certain Steel Nails From the People's Republic of China: Final Results and Final Partial Rescission of the Second Antidumping Duty Administrative Review*, 77 Fed. Reg. 12556 (Dep't of Commerce March 1, 2012) ......................................................................................... 20

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed Reg. 41821 (Dep't of Commerce Aug. 3, 2021) .......................................................................................... 3

*Multilayered Wood Flooring from the People's Republic of China*, 76 Fed. Reg. 64318 (Dep't of Commerce Oct. 18, 2011) .......................................................................................... 34

*Narrow Woven Ribbons With Woven Selvedge From Taiwan; Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 19635 (Dep't of Commerce Apr. 13, 2015) .......................................................................................... 20

*Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28710 (USTR June 20, 2018) ............................................................................................ 27, 29

*Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40823 (USTR Aug. 16, 2018) ............................................................................................................ 28, 29

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14906 (USTR Apr. 6, 2018) ........................................................................................................ 27, 29, 31

*Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. 19153 (Dep't of Commerce Apr. 12, 2004) ........................................................................................................ 24, 25, 31

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 80 Fed. Reg. 4244 (Dep't. of Commerce Jan. 27, 2015) ........................... 15

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Review; 2020-2021*, 88 Fed. Reg. 1359 (Dep't of Commerce Jan. 10, 2023) ........................................................................... 2, 6, 7, 23

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 40792 (Dep't of Commerce July 8, 2022) ......................................................................................... 3, 6

*Tapered Roller Bearings from the People's Republic of China, Final Results and Partial Rescission of Review; 2019-2020*, 87 Fed. Reg. 1120 (Dep't. of Commerce Jan. 10, 2022) .... 15

*Tapered Roller Bearings from the People's Republic of China; Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order in Accordance With Decision Upon Remand*, 55 Fed. Reg. 6669 (Dep't of Commerce Feb. 26, 1990)............ 3

**<u>Other Authorities</u>**

S. Rep. No. 67-16 (1921) ................................................................................................................. 25

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |  |
|---|---|---|
| SHANGHAI TAINAI BEARING CO., LTD. and C&U AMERICAS, LLC, | ) ) ) | **PUBLIC VERSION** |
| Plaintiffs, | ) ) | |
| and | ) ) | Court No. 23-00020 |
| ZHEJIANG JINGLI BEARING TECHNOLOGY CO., LTD., | ) ) ) | |
| Plaintiff-Intervenor, | ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response in opposition to the motion for judgment on the agency record filed by plaintiffs Shanghai Tainai Bearing Co., Ltd. (Tainai) and C&U Americas, LLC (CUA) (ECF Nos. 30 and 31), and the letter in support of that motion filed by plaintiff-intervenor, Zhejiang Jingli Bearing Technology Co., Ltd. (Zhejiang) (ECF No. 32) (collectively, plaintiffs).[1] Plaintiffs challenge certain aspects of the final results of the Department of Commerce's thirty-

---

[1] As the Court recently explained, Tainai has previously failed to explain the relationship between itself and CUA. *See Shanghai Tainai Bearing Co. Ltd. v. United States*, No. 22-00038, 2023 WL 5974083, at *1 n.1 (Ct. Int'l Trade Sept. 14, 2023) (*Tainai*). In this action, plaintiffs claim that CUA is "the importer and CEP entity." Pls. Br. at 1. We do not further address this issue, given Tainai's and Zhejiang's participation in the case.

1

fourth administrative review of its antidumping duty order on tapered roller bearings and parts thereof, finished and unfinished (TRBs), from the People's Republic of China (China).  We demonstrate below that Commerce's final results are supported by substantial evidence and otherwise in accordance with the law.  Accordingly, we respectfully request that the Court deny plaintiffs' motion and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

## I.   Administrative Determination Under Review

Plaintiffs challenge certain aspects of Commerce's thirty-fourth administrative review of the antidumping duty order on TRBs from China.  *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Review; 2020-2021*, 88 Fed. Reg. 1359 (Dep't of Commerce Jan. 10, 2023) (Final Results) (Appx001000-001002), and the accompanying Issues and Decision Memorandum (IDM) (Appx001003-001023).  The period of review is June 1, 2020, through May 31, 2021.

## II.   Issues Presented For Review

1.     Whether Commerce lawfully applied partial facts available with an adverse inference to value Tainai's unreported factors of production, based on its finding that both Tainai and its unaffiliated suppliers failed to cooperate to the best of their ability.

2.     Whether Commerce lawfully deducted duties paid by importers under Section 301 of the Trade Act of 1974 as part of its antidumping calculation.

3.     Whether Commerce lawfully "capped" Tainai's U.S. price to exclude revenues received in relation to Section 301 duties.

4.     Whether Commerce lawfully denied Tainai a byproduct offset.

## STATEMENT OF FACTS

### I.      Commerce's Administrative Review

In 1987, Commerce published the antidumping (AD) order on TRBs from China. *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, finished or Unfinished, from the People's Republic of China*, 52 Fed. Reg. 22667 (Dep't of Commerce June 15, 1987), as amended, *Tapered Roller Bearings from the People's Republic of China; Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order in Accordance With Decision Upon Remand*, 55 Fed. Reg. 6669 (Dep't of Commerce Feb. 26, 1990).  On August 3, 2021, Commerce initiated the thirty-fourth administrative review of the antidumping duty order on TRBs from China, for the period June 1, 2020, through May 31, 2021.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed Reg. 41821 (Dep't of Commerce Aug. 3, 2021) (Initiation Notice) (Appx001054).  After the timely withdrawal of requests for review for the companies initially selected as mandatory respondents, Commerce selected Tainai as a mandatory respondent because it was the exporter accounting for the next largest volume of subject merchandise and had a timely-submitted separate rate certification.  *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 40792 (Dep't of Commerce July 8, 2022) (Preliminary Results) (Appx004193), and accompanying Preliminary Decision Memorandum (PDM) at 2 (Appx004154); Second Respondent Selection Memorandum (Sept. 15, 2021) (Appx001350).  Zhejiang was not selected for individual examination.  *Id.*

In September 2021, Commerce issued the initial questionnaire to Tainai.  *See* IDM at 7 (Appx001009); Initial Questionnaire at 1-4 (Sept. 15, 2021) (Appx001353-001356).  In Section D of the initial questionnaire, Commerce solicited information about Tainai's factors of

production, as is standard practice when conducting reviews in non-market economy cases.
PDM at 13 (Appx004165); *see* Initial Questionnaire at D1-D11 (Appx001406-001416).
Commerce in the questionnaire explicitly requested that Tainai obtain factors of production
(FOP) information from its unaffiliated suppliers.  IDM at 7 (Appx001009) (*citing* Initial
Questionnaire at D1-D6 (Appx001406-001411).

      In its response to the initial questionnaire, Tainai claimed to have produced the entirety of
subject merchandise while incorporating affiliate FOP usage rates.  IDM at 7-8 (Appx001009-
001010) (citing Tainai's Response to Section D Questionnaire at 5 (Nov. 12, 2021) (Appx2135)).
Tainai did not reveal there were any issues in obtaining actual FOP information from the
unaffiliated suppliers, and Commerce found that "it does not appear that Tainai made any
attempt to request FOP information from its unaffiliated suppliers in response to the initial
questionnaire, nor did Tainai alert Commerce of any difficulties in obtaining accurate FOP
information."  IDM at 7-8 (Appx001009-001010).

      On March 29, 2022, Commerce sent Tainai a supplemental questionnaire, to be
forwarded to Tainai's unaffiliated suppliers.  Letter regarding Request for Information (Mar. 29,
2022) (Appx002619-002672).  Commerce requested that Tainai send the questionnaire directly
to its unaffiliated suppliers of TRBs and set a response due date of April 12, 2022.  *Id.* at 1, 5
(Appx002623).  But rather than forwarding the supplemental questionnaire to its suppliers on or
about the time Tainai received it (*i.e.*, March 29, 2022), Tainai apparently sent letters to its
unaffiliated suppliers over a month later – on May 5, 2022.  IDM at 8 (Appx001010) (citing
Unaffiliated Supplier Response at Ex. SD-5.1 (Appx002920).  Tainai sent the letters on or about
May 5 despite having requested and received two extensions to provide the information, on April
4, 2022, and April 22, 2022.  *See* IDM at 8 (Appx001010).  Commerce found that Tainai left its

unaffiliated suppliers only three business days to provide the requested information, given that

Tainai's response to the questionnaire was due on May 10, 2022.  *Id.* (citing Commerce Letter,

"Supplemental Questionnaire to Third-Party Suppliers Second Extension Granted," (Apr. 22,

2022) (Appx002710)).

## II.    **Commerce's Preliminary Results**

On July 8, 2022, Commerce published its preliminary results, in which Commerce

identified several deficiencies and inconsistencies in Tainai's reporting of its factors of

production data.  PDM at 13-15 (Appx004165-004167).  This included both the responses to the

initial questionnaires and the responses to supplemental questionnaires, in which Commerce

explicitly requested that Tainai provide information from its suppliers.  *See id.* at 13-14.

Commerce concluded that the unaffiliated suppliers "failed to cooperate by not providing their

FOP data, either through Tainai or directly to Commerce."  *Id.* at 15.  Commerce furthermore

concluded that Tainai itself "did not act to the best of its ability to comply with Commerce's

requests for FOP information and has demonstrated a pattern of not providing complete FOP

data."  *Id.*  Accordingly, "where Tainai's unaffiliated and uncooperative suppliers provided 100

percent of the cages for Tainai for certain CONNUMs during the POR, {Commerce} valued the

unreported cage FOPs using Tainai's highest FOP consumption rates for cages for all other

CONNUMs based on product description."  *Id.* [2]  Commerce also declined to grant a byproduct

---

[2]   "'CONNUM' is a contraction of the term 'control number,' and is Commerce jargon
for a unique product."  *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, No. 21-2205,
2022 WL 4391436, at *2 (Fed. Cir. Sept. 23, 2022) (quoting *Xi'an Metals & Mins. Imp. & Exp.
Co. v. United States*, 520 F. Supp. 3d 1314, 1321 n.4 (Ct. Int'l Trade 2021)).  Commerce defines
CONNUMs by identifying key physical characteristics of the subject merchandise that are
commercially meaningful in the United States marketplace and have an impact on costs of
production.  CONNUM-specific data allows Commerce to perform comparisons of its
constructed normal values to export prices on as precise a basis as possible.  Commerce has
required reporting factors of production on a CONNUM-specific basis using similar language in

offset for Tainai's reported scrap, "because Tainai was unable to provide either the quantity of scrap actually generated during the {period of review (POR)} pursuant to its own production process, or that of its suppliers." *Id.* at 22.  Commerce preliminarily calculated a weighted-average dumping margin of 36.03 percent for Tainai.  Preliminary Results, 87 Fed. Reg. at 40793 (Appx004164).

## III.   Commerce's Final Results

On January 10, 2023, Commerce published its Final Results.  *See* Final Results, 88 Fed. Reg. at 1359 (Appx001000) and accompanying IDM (Appx001003-001023).  In the Final Results, Commerce continued to find that the use of partial facts available with an adverse inference was appropriate, in light of Tainai's refusal to induce cooperation from its unaffiliated suppliers, and the failure of those unaffiliated suppliers to cooperate as interested parties to the review.  *See* IDM at 5-11 (Appx001007-001013).  In doing so, Commerce selected from among the facts on the record that would function to induce cooperation in the future.  *Id*. at 10-11 (Appx001012-001013).  Specifically, and as in the preliminary results, where Tainai reported that, with respect to a given CONNUM, Tainai purchased all of its bearing cages from uncooperative suppliers, Commerce relied on the highest reported usage rate for each of the factors of production on a product-specific rate based on each product description for each control number.  *See* Preliminary Calculation Memorandum at 2 (Appx004186).  Where Tainai did not source 100 percent of its bearing cages from unaffiliated suppliers for a given CONNUM, Commerce relied on the consumption rate for factors of production that Tainai reported in its factors of production database.  *Id*.  In either event, Commerce relied on Tainai's

---

antidumping proceedings for over a decade.  *See also Tainai*, 2023 WL 5974083, at *4 n.6 (explaining meaning of "CONNUM").

own data; in other words, Commerce used, as facts available with an adverse inference, data for similar items reported by Tainai's affiliated suppliers. IDM at 10 (Appx001012). The methodology and calculations were the same as set forth in the Preliminary Results, and Commerce calculated a final weighted-average dumping margin for Tainai of 36.03 percent, consistent with the Preliminary Results. Final Results, 88 Fed. Reg at 1360 (Appx001001). Zhejiang, which was not individually examined, was assigned the same rate as Tainai. *Id.*

## SUMMARY OF THE ARGUMENT

Commerce's determination should be sustained because it is supported by substantial evidence and otherwise lawful.

First, Commerce's use of an adverse inference when selecting from among the facts otherwise available on the record with respect to Tainai's unreported factors of production is supported by substantial evidence because Tainai and its unaffiliated suppliers did not provide Commerce with necessary information concerning factors of production. Despite this being the thirty-fourth administrative review of the order on TRBs, and despite Tainai being asked for the same information in the previous administrative review, Tainai failed to collect factor of production information from its upstream suppliers. On these facts, Tainai itself was uncooperative in the review with respect to FOP data from unaffiliated suppliers, and so there can be no concern here that a cooperative party has been unlawfully assigned a punitive rate. Application of an adverse inference is furthermore warranted because Tainai's suppliers are themselves "interested parties" within the meaning of 19 U.S.C. § 1677(9)(A), and those suppliers failed to respond to Commerce's questionnaire requesting the information. Moreover, Commerce's use of an adverse inference when selecting from among the facts otherwise available properly balances accuracy with the need for deterrence where, as here, both the respondent and its unaffiliated suppliers were noncooperative. Commerce has applied the

information only to factors of production for which no information was available.  By taking this

approach, Commerce has used facts available only where gaps exist in the record – gaps that,

again, were caused by Tainai's and its suppliers' failure to cooperate.

Second, Commerce lawfully deducted Section 301 duties in its calculations, consistent

with the statutory directive to deduct "United States import duties" from United States prices,

19 U.S.C. § 1677a(c)(2)(A), because Commerce reasonably determined that Section 301 duties –

which are additional duties imposed to address a foreign country's unfair act, policy, or practice

– are more akin to normal customs duties than special remedial duties that Commerce does not

deduct in its calculations.  Moreover, Commerce's deduction of Section 301 duties is consistent

with this Court's recent holding in *Tainai*.  *See Tainai*, 2023 WL 5974083, at \*15-17.

Third, Commerce lawfully capped Tainai's U.S. price to exclude revenue that Tainai

earned on Section 301 duties because Tainai itself linked these revenues to the Section 301

duties themselves, rather than to the sale of its products.

Fourth and finally, Commerce acted lawfully and consistent with its practice by denying

Tainai a byproduct offset for its sales of scrap metal, because Tainai failed to submit sufficient

evidence to substantiate that the adjustment was warranted.

## **ARGUMENT**

### I.    **Standard Of Review**

This Court sustains any determination by Commerce unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B).  "Substantial evidence" connotes "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305

U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence," and

the possibility of drawing inconsistent conclusions from the record does not render findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (noting tremendous deference to Commerce's factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment in choosing between two fairly conflicting views, even if it could "justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

Additionally, the Court affords Commerce "tremendous deference" when Commerce exercises its technical expertise to make "complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996); *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (citations omitted). Likewise, when a statute fails to make clear "any Congressionally mandated procedure or methodology for assessment of the statutory tests," Commerce "may perform its duties in the way it believes most suitable." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation omitted).

II.    **Commerce's Use Of Partial Facts Available With An Adverse Inference Is Supported By Substantial Evidence And In Accordance With Law**

    A.    **Legal Framework**

Commerce gathers information from respondent foreign producers and exporters to determine whether dumping has occurred and, if it has, to calculate dumping margins.  When required information is not available on the record; or if an interested party withholds information that has been requested by Commerce, fails to provide information by deadlines in the form and manner requested, significantly impedes an antidumping proceeding, or provides information that cannot be verified, Commerce shall "use facts otherwise available in reaching the applicable determination."  19 U.S.C. § 1677e(a)(1)-(2).  Application of § 1677e(a)(1)-(2) is sometimes referred to as the use of "neutral facts available."  *See* PDM at 13 (Appx004165).

If a record deficiency was caused by an interested party's failure to "cooperate by not acting to the best of its ability to comply with a request for information," Commerce may, in selecting from among facts available, apply an inference that is adverse to that interested party.  19 U.S.C. § 1677e(b).  This is sometimes referred to as application of "adverse facts available," or "facts available with an adverse inference."  *See* PDM at 13 (Appx004165).  An interested party's failure to cooperate to the best of its ability in complying with a request for information is "determined by assessing whether {it} has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  Thus, the statutory trigger for an adverse inference "is simply a failure to cooperate to the best of respondent's ability, *regardless of motivation or intent*."  *Id.* at 1383 (emphasis added).  Additionally, "while the {best of ability} standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping," and it requires that importers "take reasonable steps

to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce." *Id.* at 1382. "Commerce enjoys broad discretion when considering whether to apply adverse facts available in antidumping proceedings." *Tianjin Magnesium Int'l Co. v. United States*, 844 F. Supp. 2d 1342, 1346 (Ct. Int'l Trade 2012).

**B.      Both Tainai And Its Unaffiliated Suppliers Failed To Cooperate To The Best Of Their Ability**

**1.      Plaintiffs Concede That Tainai's Unaffiliated Suppliers Are Interested Parties, And Did Not Cooperate**

In selecting "facts otherwise available" to fill a gap in the record, the statute provides that if Commerce determines that an interested party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," then Commerce may use an "adverse inference" in selecting the facts on which it chooses to rely. 19 U.S.C. § 1677e(b)(1). Here, both Tainai and its unaffiliated suppliers are producers of subject merchandise – *i.e.*, "all TRBs and parts thereof, finished and unfinished, from China." IDM at 6 (Appx001008) (citing PDM at 15 (Appx004167)). Both Tainai and its unaffiliated supplies therefore are "interested parties" within the meaning of §1677e(b)(1).[3] Commerce therefore evaluated both the actions of Tainai and the actions of its unaffiliated suppliers to determine whether they complied with Commerce's requests for information "to the best of their ability." IDM at 6 (Appx001008).

Plaintiffs do not dispute that Tainai's unaffiliated suppliers are interested parties, and plaintiffs do not challenge Commerce's conclusion that those suppliers failed to cooperate by not

---

[3] In relevant part, the statute defines an "interested party" as "(A) a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise or a trade or business association a majority of the members of which are producers, exporters, or importers of such merchandise." 19 U.S.C. § 1677(9).

acting to the best of their ability.  To the contrary, plaintiffs concede that the suppliers did not

cooperate, stating that "Tainai asked these unrelated suppliers to cooperate and these suppliers

said no."  Pls. Br. at 22; *see also id.* at 23 (asserting that Tainai "ultimately failed" to secure

cooperation).

## 2. Commerce Found Tainai To Have Been Uncooperative

Rather than challenging Commerce's conclusions with respect to Tainai's unaffiliated

suppliers, plaintiffs instead challenge Commerce's determination that, because Tainai "did not

act to the best of its ability to comply with Commerce's requests for FOP information and has

demonstrated a pattern of not providing complete FOP data," Tainai's behavior itself supported

the application of an adverse inference under 19 U.S.C. § 1677e(b).  IDM at 6 (Appx001008).

Plaintiffs contend that Tainai "used its best efforts and was fully cooperative."  Pls. Br. at 18.

Plaintiffs further argue that Tainai cannot be required to submit information that it does not have.

*See id.* at 24-26.

As an initial matter, plaintiffs are incorrect in their assertion that Commerce found Tainai

to have been cooperative.  Plaintiffs assert that because Commerce "found that Tainai was

entitled to a Separate Rate and was not part of the China-Wide entity," the agency "necessarily

found that Tainai was cooperative."  Pls. Br. at 19-20.  This assertion is belied by the record.

Commerce's conclusion that Tainai was entitled to a separate rate was based not on Tainai's

cooperation, but rather on Tainai's demonstration of the absence of *de jure* and *de facto*

governmental control over its export activities.  *See* PDM at 10 (Appx004162).  Indeed,

Commerce made abundantly clear in its decision that Tainai was not cooperative.  *See, e.g.*, IDM

at 6 (explaining that in the preliminary results, Commerce "found that *Tainai* and its suppliers

failed to act to the best of their ability" and that the agency "continue{d} to find that application

of partial {facts available with an adverse inference} is appropriate in this instance") (emphasis

added)); *see also id.* at 10 (finding that "Tainai deliberately attempted to obfuscate its reporting methodology and failed to conduct prompt, careful, and comprehensive investigations of all relevant records, and that these actions sufficiently demonstrate that Tainai and its unaffiliated suppliers did not act to the best of their ability in providing the requested FOP information.").

In addition to being factually incorrect, plaintiffs in this separate rate argument put misplaced reliance on the Federal Circuit's decisions in *Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012), and *Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F.3d 1339 (Fed. Cir. 2015). Pls. Br. at 19. In *Changzhou Wujin*, a non-cooperating mandatory respondent "had not demonstrated its independence from state control," and so it was treated as part of a China-wide entity. *Changzhou Wujin*, 701 F.3d at 1371. That circumstance is not analogous to this case. And in *Ad Hoc Shrimp*, "the necessary information missing from the record was information supporting {the respondent's} claim that it was eligible for a separate rate," pursuant to 19 C.F.R. § 351.107. *Ad Hoc Shrimp*, 802 F.3d at 1356. Given the relevance of the missing information to separate rate eligibility, Commerce in *Ad Hoc Shrimp* applied total facts available with an adverse inference and found that the respondent was part of the China-wide entity – a result affirmed by the Federal Circuit. *See id.* at 1356-57. As a matter of law and logic, it is possible to be both independent from state control and noncooperative with Commerce's review. Tainai's entitlement to separate rate status is unconnected to the question of whether it cooperated to the best of its ability.

### 3.   Commerce's Finding Of Tainai's Noncooperation Is Supported By Substantial Evidence

We have demonstrated above that plaintiffs do not dispute that Tainai's unaffiliated suppliers are interested parties and that they did not cooperate to the best of their ability, within

the meaning of 19 U.S.C. § 1677e(b).  We also have demonstrated that the finding that Tainai was entitled to a separate rate does not mean Commerce found Tainai cooperative.  The question for the Court instead is whether Commerce's conclusion that Tainai was uncooperative is supported by substantial evidence.  The Court should sustain Commerce's conclusion.  Plaintiffs are not assisted by *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003), which plaintiffs assert as holding that a respondent is only responsible for the information in its own possession.  *See, e.g.*, Pls. Br. at 17 (asserting that "best efforts" includes only (1) "{r}easonable steps to maintain full and complete records"; (2) "familiarity with records in its possession, custody or control"; and (3) "prompt, careful and comprehensive investigations of all relevant records to the full extent of the importer{'}s ability to do so").  *Nippon Steel* does not so cabin a respondent's obligations under 19 U.S.C. § 1677e(b), as the case did not address obligations with respect to information that is in the possession of unaffiliated suppliers.  While a failure to maintain one's own records may support the imposition of an adverse inference, that of course is not the only behavior that may justify such an approach by Commerce.

Thus, contrary to plaintiffs' suggestion, Commerce may lawfully conclude that a respondent has failed to cooperate within the meaning of § 1677e(b) by not securing cooperation from an unaffiliated supplier.  *Cf. Mueller Comercial De Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227, 1232-34 (Fed. Cir. 2014) (describing to be addressed when applying facts available with an adverse inference to a cooperative respondent that has failed to secure cooperation).  And on the facts of this case, Commerce's finding of Tainai's noncooperation is supported by substantial evidence.  Commerce found that Tainai failed to fully cooperate for two reasons:  First, as an exporter and an affiliate of its importer of subject merchandise, Tainai knew that Commerce would require cage FOP information in the review.  IDM at 7 (Appx001009).

14

Indeed, "Commerce explicitly warned Tainai in the previous review that failure to provide complete FOP information or failure to source inputs from cooperative suppliers could lead to the application of total {adverse facts available}." *Id.* Specifically, Commerce informed Tainai in the prior review that "failure to provide complete FOP information could result in" the use of an adverse inference when selecting from among the facts otherwise available. IDM at 6 (Appx001008) (citing *Tapered Roller Bearings from the People's Republic of China, Final Results and Partial Recission of Review; 2019-2020*, 87 Fed. Reg. 1120 (Dep't. of Commerce Jan. 10, 2022), and accompanying IDM at Comment 3). Factors of production are a fundamental data point relied upon by Commerce in calculating dumping margins. Tainai is aware and has been notified that Commerce requires this data, as Tainai participated in both the 2019-2020 administrative review and the 2012-2013 new shipper review of TRBs from China. *See id.; see also Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 80 Fed. Reg. 4244 (Dep't. of Commerce Jan. 27, 2015).

This Court has held that where a producer is a "sophisticated" participant in antidumping duty proceedings, there is even less room for them to claim ignorance about what is required of respondents. *See Fusong Jinlong Wooden Grp. Co., Ltd. v. United States*, 617 F. Supp. 3d 1221, 1241-43 (Ct. Int'l Trade 2022). In *Fusong Jinlong Wooden Group*, Commerce used an adverse inference when selecting from among the facts otherwise available when the respondent, Sino-Maple, failed to provide information regarding U.S. sales by an affiliate. *Id*. Sino-Maple had been a party to several previous reviews, and the affiliate was a party to an ongoing Customs proceeding relating to the sales in question. *Id*. As such, the Court held that Sino-Maple did not "put forth its maximum effort" and "failed to fully investigate and obtain the requested" information. *Id*. at 1242. Similarly here, Tainai has been a party to multiple proceedings

regarding TRBs, including one in which this *exact same issue* appeared.  *See* IDM at 6 (Appx001008).

Even though (1) Tainai was aware of the requirement for FOP information from its suppliers at least since the final results for the previous review published on January 10, 2022, and (2) Commerce explicitly requested the FOP information from Tainai's unaffiliated suppliers in the initial antidumping duty questionnaire for this review, Tainai failed to provide the requested information.  Instead, Tainai "devised its own methodology to estimate the FOPs of its unaffiliated suppliers, without any assertion it was unable to obtain the information or any explanation of how or why its reporting methodology was an accurate or reasonable way to report the requested information."  *Id.*  Tainai's initial questionnaire response obfuscated the fact that Tainai did not report actual cage FOP information.  *Id.*  And Tainai neither attempted to request cage FOP information from its unaffiliated suppliers in response to the initial questionnaire, nor did it alert Commerce to any difficulties in obtaining the information.  *Id.* at 8 (Appx001010).

In addition to the failure to use best efforts to secure cage FOP information in response to the initial questionnaire, the letter that Tainai provided as a sample of what it later sent to its suppliers did not identify what documents were included with the sample letter, or whether Tainai included Commerce's requests outside the Section D questionnaire.[4]  Also demonstrative of Tainai's failure to put forth maximum efforts, Tainai delayed forwarding the supplemental

---

[4]  The 19 noncooperative responses that Tainai received, all within a day of sending the letter, used similar language to state that each unaffiliated supplier would not provide FOP information, but would provide the quantity and value of inputs sold to Tainai during the POR. IDM at 8 (Appx001010).

questionnaire to its suppliers, leaving them with only three business days to complete the response before the extended deadline. *Id.*

Based on these facts, Commerce found that "Tainai deliberately attempted to obfuscate its reporting methodology and failed to conduct prompt, careful, and comprehensive investigations of all relevant records, and that these actions sufficiently demonstrate that Tainai and its unaffiliated suppliers did not act to the best of their ability in providing the requested FOP information." *Id.* These conclusions are supported by substantial evidence.

Plaintiffs do not dispute any of the above. Instead, plaintiffs' sole challenge to Commerce's application of partial facts available with an adverse inference is based on an assertion that "Tainai does not have market power to obtain cooperation." Pls. Br. at 20. Plaintiffs assert that Tainai is not large, uses many suppliers, and is a small portion of its suppliers' business. *See* Pls. Br. at 20-22. Relying on *Venus Wire Industries Pvt. Ltd. v. United States*, 471 F. Supp. 3d 1289 (Ct. Int'l Trade 2020), plaintiffs assert that "Commerce must consider the evidence showing why the efforts for cooperation failed and whether the respondent had the practical ability to force cooperation." Pls. Br. at 22.

Of course, this argument ignores the basis for Commerce's finding that Tainai failed to act to the best of its ability. In any event, plaintiffs' argument is inapposite. In *Venus Wire*, Commerce only requested the missing supplier information after the preliminary determination. When the respondent was unable to procure the information, Commerce applied total adverse facts available to the otherwise cooperative respondent. *Venus Wire*, 471 F. Supp. 3d at 1306. Those facts are nothing like this case. Here, Commerce requested factors of production information from the outset of the review and repeatedly requested that information; Commerce also documented Tainai's failures during the review; and Commerce limited the application of

facts available with an adverse inference, applying such facts only to data that was never provided''. And rather than alerting Commerce to any problems in securing the requested information, Tainai chose to remain silent.

This case is more similar to *Xiping Opeck Food Co.*, 222 F. Supp. 3d 1141, 1159 (Ct. Int'l Trade 2017), and *An Giang Fisheries*, 287 F. Supp. 3d 1361, 1373 (Ct. Int'l. Trade 2018). In both *Xiping Opeck Food Co.* and *An Giang Fisheries*, this Court interpreted and applied the "inducement/evasion considerations" present in *Mueller*, and concluded that where it is possible to induce cooperation of unaffiliated third parties, failure to induce that cooperation may be reason enough to support application of facts available with an adverse inference. In *Xiping Opeck Food Co.*, Commerce's determination that the respondent had the ability to induce cooperation from its suppliers of crawfish meat was sustained because the respondent had existing exclusive relationships with its suppliers and was the largest company operating in the market exporting to the United States, which left its suppliers with few other options for selling their products. *Xiping Opeck Food Co.*, 222 F. Supp. 3d at 1158-59. Similarly, in *An Giang Fisheries*, the Court sustained Commerce's determination that the respondents had the ability to induce cooperation from unaffiliated suppliers because the respondents did not "for example, {refuse} to do business" with the uncooperative suppliers, "who they had an ongoing business relationship with, unless they cooperated." *An Giang Fisheries*, 287 F. Supp. 3d at 1373. The Court held that where existing business relationships can be leveraged to induce cooperation, but are not, it was reasonable to apply an adverse inference as part of an overall policy of deterrence. *Id*. (citing *Mueller*, 753 F. 3d at 1233).

Here, while plaintiffs assert that Tainai had no ability to induce compliance from its unaffiliated suppliers, the facts are similar to both *An Giang Fisheries* and *Xiping Opeck Food*

*Co.*  Tainai had existing business relationships with its TRB cage suppliers prior to the onset of this administrative review.  IDM at 9 (Appx1011).  Additionally, as Commerce explained, "Tainai was selected for individual examination . . . because it accounted for the largest volume of entries of subject merchandise during the POR.  Based on Tainai's large volume of entries . . . it is reasonable to conclude that Tainai is an important customer to its Chinese TRB suppliers since it is through Tainai that these suppliers can sell their merchandise in the United States."  *Id*.

We recognize that the Court in *Tainai* was not convinced by Commerce's conclusion that Tainai's large volume of entries and quantity of purchased TRBs demonstrated that Tainai had leverage over its unaffiliated suppliers.  The Court instead held that "{a}lthough it is true that Shanghai Tainai purchased a large quantity of tapered roller bearing parts from its suppliers as a collective group, Commerce's analysis ignored the other side of the equation – whether such quantity was significant as to each supplier."  *Tainai*, 2023 WL 5974083, at *10.  In this case, however, even if the Court were to view Tainai's volumes of entries and purchased quantities as, standing alone, insufficient to support a conclusion that Tainai had the ability to secure cooperation, Tainai failed to take steps to encourage cooperation from the unaffiliated suppliers, for example by diligently seeking information from those suppliers.  This, combined with Tainai's importance as a customer, provides substantial evidence in support of Commerce's determination.  And unlike in *Tainai*, here, as explained above, Commerce based its decision on *Tainai's* failure to cooperate – not simply on its suppliers' failure.  *Tainai*, 2023 WL 5974083, at *8 ("Commerce's ultimate decision to apply facts otherwise available with an adverse inference against Shanghai Tainai's missing factors of production data was therefore not grounded in

Plaintiff's failure to 'act to the best of its ability to comply with a request for information,' as § 1677e(b) would seem to require.").

Commerce's conclusion here is consistent with established administrative practice concerning missing data from unaffiliated suppliers.  For instance, in *Narrow Woven Ribbons*, Commerce partially used an adverse inference when selecting from among the facts otherwise available because unaffiliated ribbon suppliers declined to report their costs related to subject merchandise and thus failed to cooperate with Commerce's requests for information.  *See Narrow Woven Ribbons With Woven Selvedge From Taiwan; Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 19635 (Dep't of Commerce Apr. 13, 2015), and accompanying IDM at Comment 7.  In that matter, Commerce determined that the unaffiliated ribbon suppliers were interested parties within the meaning of § 1677(9)(A), because the suppliers produced ribbons and then sold the ribbons to the mandatory respondent who, after further processing, exported the ribbons to the United States during the period of review.  *Id*.; *see also Certain Steel Nails From the People's Republic of China: Final Results and Final Partial Rescission of the Second Antidumping Duty Administrative Review*, 77 Fed. Reg. 12556 (Dep't of Commerce March 1, 2012), and accompanying IDM at Comment 5 (concluding that "it is crucial for suppliers of subject merchandise to provide their own factors of production data because suppliers actually provide finished merchandise independently subject to the Order, in contrast to tollers who only perform a process at one stage of the production.").  On that basis, Commerce determined that application of partial facts available with an adverse inference was appropriate.

For the same reasons, use of an adverse inference when selecting from among the facts otherwise available is appropriate here, particularly given that the application of that inference

20

was limited to areas where the gaps in the record were due to the noncooperation of both Tainai
and its unaffiliated suppliers.

      **4.**      **Commerce's Determination To Fill The Gap In The Record With Tainai's Own Data As An Adverse Inference Is Supported By Substantial Evidence And In Accordance With Law**

We demonstrated above that Commerce lawfully determined that Tainai and its
unaffiliated producers failed to act to the best of their ability to provide Commerce with the
required data, and Commerce therefore lawfully resorted to an adverse inference in selecting
from facts otherwise available to fill the resulting gap in the record.  IDM at 10 (Appx001012).
Plaintiffs argue that the factors of production selected by Commerce as partial adverse facts
available were "highly distorted."  *See* Pls. Br. at 27-29.  In support, plaintiffs rely on *Diamond
Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351 (Fed. Cir. 2021), and assert
that "calculating dumping margins as accurately as possible" is the most important goal in an
antidumping proceeding when Commerce must fill gaps in the record.  *See* Pls. Br. at 27-28.

While "accuracy" is important in antidumping proceedings, "a Commerce
determination . . . is 'accurate' if it is correct as a mathematical and factual matter, thus
supported by substantial evidence."  *Nan Ya Plastics Corp., Ltd. v. United States*, 810 F. 3d
1333, 1344 (Fed. Circ. 2016).  In other words, so long as Commerce's determination adheres to
the statutory scheme and is mathematically correct, then it can be deemed "accurate" if it is
supported by substantial evidence.  *See id.*

Nor can plaintiffs claim that Commerce's approach is inconsistent with "commercial
reality."  Pls. Br. at 29.  Again, an antidumping rate is "accurate" if it is properly calculated and
consistent with the text and purpose of the statute.  *See Nan Ya* at 1344.  And a Commerce
determination "reflects 'commercial reality' if it is consistent with the method provided in the
statute, thus in accordance with law."  *Id.*  Here, Commerce determined, in accordance with the

statute, that Tainai did not act to the best of its ability to comply with Commerce's requests for information, by failing to induce its suppliers to provide the requested data when it otherwise was on notice that such information would be required and where Commerce determined that such information was within Tainai's control to provide. *See* IDM at 9 (Appx001011). As such, the only relevant question with respect to the "accuracy" and "commercial reality" of the resulting dumping rate is whether Commerce supported its determination with substantial evidence, such that "a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S.at 229; *see Nan Ya* at 1344; *Diamond Sawblades*, 986 F.3d at 1365-66.

In *Tainai*, the Court concluded that Commerce's application of facts available with an adverse inference "failed to properly take into account the predominant interest in accuracy." *Tainai*, 2023 WL 5974083, at *10 (quoting *Mueller Comercial De Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227, 1233 (Fed. Cir. 2014), for the proposition that "Commerce may rely on {deterrence} policies as part of a margin determination for a cooperating party . . . as long as the application of those policies is reasonable on the particular facts *and the predominant interest in accuracy is properly taken into account as well*") (emphasis in *Tainai*)). The Court concluded that Commerce must "appropriately balance the competing goals of accuracy and deterrence when it selects facts otherwise available with an adverse inference." *Tainai*, 2023 WL 5974083, at *10.

*Tainai* presents a different set of facts from this case. In *Tainai*, Commerce had assigned Tainai an antidumping margin of 538.79 percent, which the Court described as "eye-popping." *Id.* at *11. That margin was more than both Commerce's preliminary rate (36.75 percent) and the China-wide rate (92.84 percent). *See id.* Here, in contrast, the 36.03 percent rate assigned to

Tainai is the same as the preliminary rate for this review and is significantly lower than the China-wide rate, which remained 92.84 percent during this period of review.  Final Results, 88 Fed. Reg. at 1360 (Appx001001).  Thus, the 538.79 percent margin that was a significant focus of the Court's analysis in *Tainai* is not present here.

This case is also different from *Tainai* (and *Mueller*) because, as demonstrated above, here Commerce found that Tainai itself did not cooperate to the best of its ability.  Thus, in "balanc{ing} the competing goals of accuracy and deterrence when it selects facts otherwise available with an adverse inference," *Tainai*, 2023 WL 5974083, at *10, Commerce here was faced with *both* a noncooperating respondent *and* noncooperating unaffiliated suppliers.  When Commerce concluded that it would "rel{y} on the product description (*i.e.,* PRODUCTU) to determine the partial {adverse facts available} rate because using all of the product characteristics would have amounted to an application of neutral facts available," IDM at 10 (Appx001012), that conclusion served to avoid rewarding the noncooperation of both Tainai and its suppliers.  And as to these facts, Commerce concluded that it would "rel{y} on the product description to apply partial {adverse facts available} to the missing cage FOPs because it is accurate to group each of the products by their description and functions to induce cooperation while limiting the breadth of the application of {adverse facts available}."  *Id.* at 11 (Appx001013).  In doing so, Commerce used CONNUM-specific attributes to apply partial facts available with an adverse inference, while avoiding use of characteristics that would have led to the application of neutral facts.  This approach was lawful and supported by substantial evidence.

**III.    Commerce's Deduction Of Section 301 Duties Is In Accordance With Law And Supported By Substantial Evidence**

Plaintiffs next claim that Commerce improperly deducted Section 301 duties in its calculations, allegedly in violation of the statutory directive to deduct "United States import

duties" from U.S. prices.  *See* Pls. Br. at 30 (citing 19 U.S.C. § 1677a(c)(2)(A)).  Contrary to this claim, Commerce reasonably deducted Section 301 duties because it does not consider Section 301 duties "special duties" warranting exclusion, and thus they must be deducted from the United States prices in calculating dumping margins under § 1677a(c)(2)(A).  *See* IDM at 15-17 (Appx001017-001019).

Section 1677a(c)(2)(A) states that the price used to establish export price and constructed export price shall be reduced by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, *and United States import duties*, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."  19 U.S.C. § 1677a(c)(2)(A) (emphasis added).  The key issue is whether Section 301 duties are excluded from the statutory requirement to deduct "United States import duties."

In this regard, Commerce considers antidumping duties to be distinct from normal selling expenses and customs duties because (unlike antidumping duties) normal customs duties have no remedial purpose.  *See APEX Exports v. United States*, 777 F.3d 1373, 1379 (Fed. Cir. 2015).  Antidumping duties, on the other hand, are "special duties" that implement a trade remedy.  *See Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1358, 1361 (Fed. Cir. 2007) (recognizing Commerce's exclusion of antidumping duties under § 1677a(c)(2)(A) as "special duties" distinct from "United States import duties"); *Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. 19153, 19159 (Dep't of Commerce Apr. 12, 2004) (*SWR Korea*).  Moreover, "{a}lthough the {antidumping duty} law does not define the term 'United States import duties,' the Senate Report that accompanied the Antidumping Act of 1921 (the '1921 Act') contrasts antidumping duties (which it refers to as 'special dumping duties') with normal customs duties

(which it refers to as 'United States import duties'). . . .   Thus, Congress has long recognized that at least some duties implementing trade remedies – including at least antidumping duties – are special duties that should be distinguished from ordinary customs duties." *SWR Korea*, 69 Fed. Reg. at 19159 (citing S. Rep. No. 67-16, at 4 (1921)); *see Wheatland*, 495 F.3d at 1361 (discussing *SWR Korea*).

Hence, as this Court stated, "antidumping duties are an element of a fair and reasonable price," not an import duty or cost associated with importation. *Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213, 1220 (Ct. Int'l Trade 1998).  "It is therefore reasonable for Commerce not to treat antidumping duties as costs of importation when calculating export price." *APEX Exports*, 777 F.3d at 1379.

Likewise, in *Wheatland*, the Federal Circuit sustained Commerce's determination that safeguard duties imposed under Section 201 of the Trade Act of 1974 constitute special duties that do not fall within the ambit of § 1677a(c)(2)(A).[5]  Commerce in *Wheatland* compared Section 201 safeguard duties both to normal customs duties and to antidumping duties in order to determine how Congress would have intended Section 201 duties to be treated in achieving the antidumping statute's purposes. *Wheatland*, 495 F.3d at 1361-62.  Commerce identified several similarities between Section 201 safeguard duties and antidumping duties and determined that Section 201 duties are "special dumping duties" because they are "more like {antidumping duties} in purpose and function than they are like ordinary customs duties." *Id*. at 1362 (citation omitted).  The Federal Circuit agreed, stating that "{g}iven the similarities between antidumping

---

[5]  Section 201, 19 U.S.C. § 2251, "permits the President of the United States to impose safeguard duties on imported merchandise if the merchandise 'is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article.'" *Wheatland Tube*, 495 F.3d at 1357 (quoting § 2251).

duties and Section 201 safeguard duties and given the fact that Section 201 safeguard duties were not enacted until 1974 and therefore could not have been considered either 'United States import duties' under § 1677a(c)(2)(A) as originally enacted in 1921 or 'special dumping duties,' it was reasonable for Commerce to conclude that Section 201 safeguard duties are more like antidumping duties 'in purpose and function than they are like ordinary customs duties.'" *Id.*

Conversely, the Federal Circuit affirmed this Court's decision in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023), and held that Commerce lawfully treated duties imposed by the President under Section 232 of the Trade Expansion Act of 1962 as "United States import duties" under section 1677a(c)(2)(A). *Id.* at 34-36. In its decision, the Federal Circuit held that the language of the Presidential proclamation imposing the Section 232 duties "makes clear that the duty newly being imposed was to add, and not to partly or wholly offset, the antidumping duties that would be due without the new duty." *Id*. at 34. Moreover, the Federal Circuit distinguished its holding from *Wheatland Tube*, which this Court had relied upon in sustaining Commerce's decision to deduct the Section 232 in its calculations pursuant to § 1677a(c)(2)(A). *Id*. at 34-36. The Federal Circuit also held that it was not necessary to analyze the "distinction between 'normal duties' and 'special duties'" and relied instead on the language of the Presidential proclamation. *Id*. at 36. And most recently this Court held that "{u}nder *Borusan*, Commerce's decision to treat Section 301 duties as deductible 'United States import duties' is correct." *Tainai*, 2023 WL 5974083, at *16.

This Court should sustain Commerce's determination to deduct Section 301 duties, as it does for Section 232 duties, because the Section 301 duties in question are likewise an additional *ad valorem* duty imposed on the Chinese origin goods that should be deducted from United States prices. The purpose of Section 301 is to authorize the Office of the United States Trade

Representative (USTR) to investigate and enforce domestic rights under trade agreements and to respond to certain foreign trade practices.  *See* 19 U.S.C. § 2411.  It thus permits USTR, subject to direction by the President, to take action "to enforce such rights or to obtain the elimination of such act, policy, or practice {of a foreign country}."  *Id.* at § 2411(a)(1).

Relevant to this case, the President in August 2017 directed USTR to initiate a Section 301 investigation.  *See Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39007 (Executive Office of the President Aug. 17, 2017).  After a notice and comment period, USTR determined that "the acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation covered in the investigation are unreasonable or discriminatory and burden or restrict U.S. commerce."  *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14906 (USTR Apr. 6, 2018) (Section 301 Determination).  As a result, as directed by the President and pursuant to sections 301(b) and (c), USTR proposed an increase in tariffs on certain goods of Chinese origin, and included a list of tariff subheadings for the products of Chinese origin that would be covered by this action.  *Id.* at 14907-10.  In June 2018, USTR implemented that action and proposed an additional action of imposing a 25 percent tariff increase on a second tranche of products.  *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28710 (USTR June 20, 2018) (Section 301 Implementation Notice).  Further actions also followed.  *E.g.*, *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices*

*Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40823

(USTR Aug. 16, 2018) (August 2018 Notice) (increasing tariffs on additional products).

The Section 301 duties at issue in this case are akin to the Section 232 duties at issue in

*Borusan*.  In affirming Commerce's decision to deduct Section 232 duties in *Borusan*, the

Federal Circuit held that the language of Proclamation 9705, which authorized the Section 232

duties, "makes clear that the duty newly being imposed was to add to, and not partly or wholly

offset, the antidumping duties that would be due without the new duty."  *Borusan*, 63 F.4th at 34.

Specifically, Proclamation 9705 states that "imports . . . shall be subject to an additional 25

percent ad valorem rate of duty with respect to goods entered or withdrawn from warehouse for

consumption . . . *in addition to any other duties*{.}"  *Id.* (citation omitted).  The Federal Circuit

also observed that "{t}he context confirms the evident meaning of this declaration – that the duty

should be charged on top of otherwise-determined antidumping duties," meaning it should be

deducted in the antidumping calculations.  *Id*. at 34-35.  Otherwise, "Proclamation 9705 would

offset substantially or completely by a reduction in the antidumping duty itself (through an

increase in the U.S. price and therefore a decrease in the dumping margin), defeating the evident

'in addition to' prescription of Proclamation 9705."  *Id*. at 35 (citation omitted).

Similarly, the language promulgating the Section 301 duties is clear in its intention.

Indeed, the initial Section 301 Determination states that Section 301 duties are intended to

increase the tariffs on certain goods of Chinese origin by imposing *an additional duty*:

> {T}he proposed action is *an additional duty* of 25 percent on a list
> of products of Chinese origin identified in the Annex to this
> Notice.  For example, if a good of Chinese origin is currently
> subject to a zero *ad valorem* rate of duty, the product would be
> subject to a 25 percent *ad valorem* rate of duty; if a good of
> Chinese origin were currently subject to a 10 percent *ad valorem*
> rate of duty, the product would be subject to a 35 percent *ad*
> *valorem* rate of duty; and so on.

Section 301 Determination, 83 Fed. Reg. at 14907 (emphasis added); *see id.* at 14908 (seeking

comment on "whether maintaining or imposing *additional duties* on a particular product would

cause disproportionate economic harm to U.S. interests" (emphasis added)); Section 301

Implementation Notice**,** 83 Fed. Reg. at 28710 (stating that "{t}he U.S. Trade

Representative . . .  has determined that appropriate action in this investigation includes the

imposition of an *additional ad valorem duty* of 25 percent on products from China" (emphasis

added)); August 2018 Notice, 83 Fed. Reg. at 40823 (same).  Indeed, similar to the proclamation

in *Borusan*, USTR's Section 301 Implementation Notice states that the Section 301 duties "apply

*in addition to all other applicable duties, fees, exactions, and charges*."  83 Fed. Reg. at 28711

(emphasis added); August 2018 Notice, 83 Fed. Reg. at 40824.  This clearly indicates that

Section 301 duties are intended to be imposed *in addition* to any other duties.  *See Borusan*,

63 F.4th at 34-36; *Tainai*, 2023 WL 5974083, at *16.  Therefore, in line with the Federal

Circuit's reasoning in *Borusan* and this Court's reasoning in *Tainai*, the Section 301 duties are

intended to be an additional duty to other existing duties.  *See id.*  Plaintiffs' claim that *Borusan*

is "of limited probative value" is unpersuasive.  Pls. Br. at 31.

    Plaintiffs assert that Section 301 duties "provide only temporary relief," and "terminate

once the conduct sought to be remedied no longer exists."  Pls. Br. at 31.  Plaintiffs also assert

that the duties "are subject to a 4 year review cycle to determine whether they should remain in

place," which, in plaintiffs view, "is akin to the antidumping duty law which provides for a five-

year sunset review process wherein the order terminates in the event that the underlying

conditions no longer exist."  *Id.* (citing 19 U.S.C. § 1675(c)); *see Wheatland*, 495 F.3d at 1362

(distinguishing time-limited "special duties" under Section 201 from normal customs duties,

which are permanent unless modified by Congress).  We also recognize that this Court held in

*Borusan* that "lack of permanence is not a viable reason to distinguish Section 201 duties from Section 232 duties." *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 494 F. Supp. 3d 1365, 1374-75 (Ct. Int'l Trade 2021) (*Borunsan CIT*), *aff'd on other grounds* 63 F.4th 25 (Fed. Cir. 2023). Notwithstanding the Court's statement, however, it sustained Commerce's determination to treat Section 232 duties as United States import duties, *Borunsan CIT*, 494 F. Supp. 3d at 1375-76, and the Court should do so for Section 301 duties as well. Moreover, as the Court held in *Tainai*, it is the text of the legal order implementing the duty that is paramount, rather than the general nature of the statute:

> *Borusan* instructs that it is the text of the legal order levying duties that is paramount; and it is unnecessary for a reviewing court to apply the *Wheatland Tube* factors where that text has spoken clearly. *See Borusan*, 63 F.4th at 36 ("We do not decide whether {the holding} could soundly rest on distinctions between § 232 and the § 201 regime more generally, and the distinction between 'normal' and 'special' duties . . . . That approach presents challenges that we may avoid. The Commerce decision sufficiently rests on the proclamation-specific basis set forth above."). If the legal instrument enacting statutory duties provides that such duties are intended to be additional to existing duties, then it is reasonable for Commerce to treat them as "United States import duties" and deduct them from the U.S. price when calculating dumping margins.

*Tainai*, 2023 WL 5974083, at * 17.[6]

---

[6] We further submit that USTR's authority to modify or terminate Section 301 duties is different from the strict limitations on special duties, such as the antidumping statute provisions providing that the duties will terminate after five years *unless* relevant agencies affirmatively determine that revocation of the order would lead to dumping *and* that material injury to the domestic industry would be likely to continue or recur. *See* 19 U.S.C. § 2417(a)(1); 19 U.S.C. §§ 1675(c)(1), (d)(2); *Wheatland*, 495 F.3d at 1362. Section 301 duties, by contrast, may continue if USTR receives a written request for continuation of the duties. *See* 19 U.S.C. § 2417(c). Therefore, even as to the question of temporal duration, Section 301 duties are more akin to normal United States import duties under section 1677a(c)(2)(A), to say nothing of the clear intent that these particular Section 301 duties be in addition to other duties. But the Court need not reach that issue given the instruction in *Borusan* to focus on the text of the legal orders at issue.

Plaintiffs next argue that "{t}hese Section 301 duties are focused on resolving certain conduct by China and Chinese exporters, just as Antidumping duties are focused on resolving certain other conduct by China and Chinese exporters." Pls. Br. at 31-32. In contrast, according to plaintiffs, "ordinary duties are not focused on resolving specific conduct, but rather are applied across the board to all trading partners." *Id.* at 32. For this reason, plaintiffs assert, applying deducting Section 301 duties would be "distortive." *Id.* at 32.

As the Federal Circuit recognized in *Wheatland*, Section 201 and antidumping duties are similarly remedial because they are "directed at the same overarching purpose – protecting the bottom line of domestic producers." *Wheatland*, 495 F.3d at 1363-64. In contrast, Section 301 duties are not remedial in the AD/CVD sense of providing relief to an injured domestic industry, nor in the Section 201 sense of facilitating positive adjustment by a domestic industry being subjected to serious injury or the threat thereof by foreign imports. *See SWR Korea*, 69 Fed. Reg. at 19159 (finding that Section 201 duties were similar to antidumping duties, and therefore special remedial duties, because they are intended to provide "temporary relief for an industry suffering from serious injury" (citation omitted)). Rather, Section 301 focuses on enforcing the United States' rights under trade agreements and eliminating improper foreign practices. 19 U.S.C. §§ 2411(a)(1), (b). Indeed, the stated purpose of the Section 301 duties at issue in this case is to curb "certain acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation" that are damaging to United States economic interests. Section 301 Determination, 83 Fed. Reg. at 14906. Although the practices may burden United States commerce, that does not make the overarching purpose of Section 301 to provide a remedy to the domestic industry. Thus, Section 301 duties *do not* have the same remedial purpose of addressing domestic injury as AD/CVD and Section 201 duties.

Because Section 301 duties serve a different purpose from antidumping duties, it is irrelevant that Commerce "does not deduct either countervailing or antidumping duties from the U.S. price." Pls. Br. at 30. Moreover, as the Federal Circuit recognized in both *Borusan* and *APEX*, deducting antidumping duties presents a unique double-counting issue because they pertain to the very thing being calculated. Thus, deducting antidumping duties would prompt a circular calculation, in which each deduction changes the dumping rate, which in turn prompts further deduction, and so on. *See Borusan*, 63 F.4th at 35 (noting that "{a}ntidumping duties cannot be subtracted in the calculation of dumping margins (and hence antidumping duties), because doing so would produce a spiraling circularity," citing *APEX Exports*, 777 F.3d at 1379 & n.2). As a result, the double-counting concerns that have led Commerce not to deduct remedial special duties in the antidumping context do not have the same force in the context of Section 301 duties. *Cf. Borusan*, 494 F. Supp. 3d at 1375 (holding that "{t}here is a clear statutory interplay between Section 201 duties and antidumping duties, while Section 232 does not reveal any such coordination concerns"). Consequently, Commerce's calculation methodology should be sustained.

**IV.**   **Commerce Reasonably Capped Section 301 Duty Payments**

As explained above, Commerce "will normally reduce U.S. price by United States import duties if they are included in U.S. price" and it is Commerce's practice to consider Section 301 duties to be normal import duties. IDM at 17 (Appx001019). In addition to challenging Commerce's actions with respect to the amounts of the duties – a challenge that we have demonstrated to be unavailing – plaintiffs also assert that revenue, *i.e.* profit, associated with the Section 301 duties should not be deducted from the U.S. price. *See* Pls. Br. at 32-37. However, Commerce's determination not to further adjust the U.S. price is in accordance with the law and consistent with Commerce's prior practice.

Regulations require "Commerce to use, in calculating U.S. price, a price which is net of price adjustment that is reasonably attributable to the subject merchandise." IDM at 17-18 (Appx001019-001020) (citing 19 C.F.R. § 351.401(c)). "Price adjustment" is defined as "any change in the price charged for subject merchandise or the foreign like product, such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale that is reflected in the purchaser's net outlay." IDM at 18 (Appx001020) (citing 19 C.F.R. § 351.102(b)(38)). Commerce determined that "it would be inappropriate to treat the excess revenues associated with Tainai's expenses as price adjustments under 19 C.F.R. § 351.401(c) because these revenues do not represent 'changes in the price for subject merchandise,' such as discounts, rebates, and post-sale price adjustments." IDM at 18 (Appx001020). Instead, Commerce explained, the additional revenue "represents profit on the sale of *services*, not profit on the sale of the *merchandise*." *Id.* (emphasis added).

Plaintiffs claim that "{w}hether or not these payments were collected because of the Section 301 duties, these payments ultimately represented revenue received by Tainai on a specific sale" and thus should have resulted in a price adjustment. Pls. Br. at 33. Plaintiffs further claim there is "no legal basis to distinguish between these payments and other payments made for goods." Pls. Br. at 37.

Commerce, however, lawfully refused to deduct this additional revenue, in accordance with its regulations and Commerce's practice. As explained above, 19 CFR § 351.401(c) and 19 CFR § 351.102(b)(38) limit the scope of "price adjustment" to "any change in the price charged for subject merchandise or the foreign like product." Based on this regulatory guidance, Commerce determined that revenues from Tainai's collection of Section 301 duties did not

represent "changes in the price for subject merchandise," such as discounts, rebates, and post-sale adjustments.  IDM at 18 (Appx001020).

It is Commerce's practice "not to attribute revenue from related expenses to the price of subject merchandise because that uncapped amount represents profit on the sale of services, not profit on the sale of the merchandise."  IDM at 18 (Appx001020) (citing *Certain Quartz Surface Products from India*, 85 Fed. Reg. 25391 (Dep't of Commerce May 1, 2020), and accompanying IDM at Comment 2); *see also Multilayered Wood Flooring from the People's Republic of China*, 76 Fed. Reg. 64318 (Dep't of Commerce Oct. 18, 2011), and accompanying IDM at Comment 39.  Here, Commerce found that "these additional revenues directly relate to U.S. import duties (*i.e.*, Section 301 duties) and not the TRBs themselves" and thus "it would be inappropriate to attribute this revenue to subject merchandise when it is attributable to U.S. import duties."  IDM at 19 (Appx001021).  This situation is, as Commerce lawfully concluded, analogous to another longstanding practice regarding offsets to freight revenue.  *Id*.  For instance, in *CTL Plate from Germany*, Commerce "declined to treat freight-related revenues as additions to U.S. price under {19 U.S.C. § 1677a(c)} or as price adjustments under 19 CFR 351.102(b).  Rather, {Commerce has} incorporated freight-related revenues as offsets to movement expenses because they relate to the movement and transportation of subject merchandise."  *Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany*, 82 Fed. Reg. 16360 (Dep't. of Commerce April 4, 2017), and accompanying IDM at Comment 6.  Thus, where Commerce considered the sale of services related to the product as distinct from the sale of merchandise itself, Commerce has found "it would be inappropriate to increase the gross unit price for subject merchandise because of profits earned on the provision or sale of freight; such profits should be attributable to the sale of the freight service, not to the subject merchandise."  *Id*.  Because the additional revenue associated

with the Section 301 duties "represents profit on the sale of services, not profit on the sale of the merchandise," Commerce's determination not to deduct those revenues from U.S. price is lawful. IDM at 18 (Appx001020).

This Court in *Tainai* held that Commerce in that administrative review had not adequately explained "what 'service' Shanghai Tainai provided its customers by passing along the padded cost of the Section 301 duties to them," and that it was "unclear why these amounts were attributable to the sale of services when 'uncapped'" but could become part of U.S. price up to the amount of the Section 301 duties." *Tainai*, 2023 WL 5974083, at *18. The Court also found unreasonable Commerce's interpretation that U.S. import duty revenues are not included in the list provided in 19 C.F.R. § 351.102(b)(38). The Court observed that the list of terms in § 351.102(b)(38) "is bookended by the terms 'such as' and 'or other adjustment.'" *Id.* For this reason, the Court held that "{t}hese terms clarify that the regulation's list of price adjustments is not exhaustive, and a change in price need not be enumerated in order to qualify as a 'price adjustment' within the meaning of § 351.401(c)." *Id.* The Court ordered a remand for Commerce to "explain why the amounts at issue constitute profits on the sale of services rather than profits on the sale of merchandise and . . . consider whether there is any basis to exclude such amounts from the 'price adjustments' described by § 351.401(c) and § 351.102(b)(38)." *Id.*

With recognition of the Court's holding in *Tainai*, we respectfully submit that substantial evidence in this review supports Commerce's determination that profit attributed to Section 301 duties is not reasonably attributable to the subject merchandise, as would be required for inclusion in the U.S. price. "The burden of demonstrating entitlement to and the extent of an adjustment lies with the interested party in possession of the relevant information." *Assan Aluminyum Sanayi v. Ticaret A.S.*, 624 F. Supp. 3d 1343, 1374 (Ct. Int'l Trade 2023). Here,

Tainai stated in a questionnaire response that "the field 'tariff charge' (i.e. , TARCHARU) is an amount that Tainai charged its customers for section 301 duties imposed on certain sales of TRBs."  IDM at 18 (Appx001020) (citing Response to Section C Questionnaire at C-17 (Appx001942)).  In the questionnaire response cited by Commerce in the IDM, Tainai described this charge as "the additional charge paid by the Customers to offset the Section 301 additional tariffs."  *Id.*  Moreover, in its business proprietary submission, Tainai further described these amounts as follows:

[


]

BPI Section C Resp. at C-17 (Appx080983) (emphasis added).  Thus, Tainai itself has linked these charges to the Section 301 duties.  Substantial evidence supports Commerce's conclusion, and the Court should sustain it.

**V.  Substantial Evidence Supports Commerce's Decision To Not Apply A Byproduct Offset**

Because this administrative review involves a nonmarket economy, namely China, Commerce must determine the subject merchandise's "normal value" based on factors of production, and not on sales in China, because "sales of {the product} in {an NME} country do not reflect the fair value."  19 U.S.C. § 1677(18)(A); *see also* 19 U.S.C. § 1677b(a)(1)(A)-(C). Commerce grants offsets to normal value "for sales of byproducts generated during the production of subject merchandise, if the respondent can demonstrate that the by-product is either resold or has commercial value and re-enters the respondent's production process."  *Arch Chems., Inc. v. United States*, 33 C.I.T. 954, 956 (2009).  The evidentiary burden is on the respondent to "substantiate by-product offsets by providing {Commerce} with sufficient

BUSINESS PROPRIETARY INFORMATION REDACTED

information to support its claims." *Id.*; *see* 19 C.F.R. § 351.401(b)(1)-(2).  This is required for

Commerce to determine whether the respondent's production process actually generated the

amount of scrap claimed as a byproduct offset.  *See Am. Tubular Prod., LLC v. United States*,

847 F.3d 1354, 1361 (Fed. Cir. 2017) (holding that "{a}bsent evidence linking the scrap sold

with any scrap generated resulting from the production of {the subject product} during the

period of review, Commerce properly found that {respondent's} submissions were insufficient

and properly denied the requested offset").  The permitted offset amount is then limited to the

total byproduct production quantity.  *Juancheng Kangtai Chem. Co. v. United States*, No. 14-56,

2015 WL 4999467, at *40 (Ct. Int'l Trade Aug. 21, 2015) (noting that "Commerce has described

its normal by-product offset practice as limited to the total production quantity of the by-

product . . . produced during the {period of review}, so long as it is shown that the byproduct has

commercial value" (quotation omitted)).

Here, Commerce denied Tainai a byproduct offset because it failed to substantiate that

the adjustment was warranted.  *See* IDM at 20-21 (Appx001022-001023).  Plaintiffs admit that

"due to the record maintained in the ordinary course of business, *the quantity of scrap produced*

*is not directly recorded*."  Pls. Br. at 37 (emphasis added).  Plaintiffs thus concede that Tainai

does not keep records such that it can demonstrate entitlement to an offset.

Notwithstanding this shortcoming, plaintiffs argue that Commerce's procedures should

be ignored because Tainai explains how it allocated and sold the scrap produced.  *Id.*  Plaintiffs

further contend that there is no record evidence that Tainai purchased and resold the scrap in

question.  *Id.*  However, without Tainai's reporting, Commerce is unable to determine the

quantity of the scrap generated during the POR – the information that Commerce needed to grant

a byproduct offset:

> While we find that Tainai's sales documentation demonstrates that steel scrap has commercial value, we remain unable to properly reconcile the quantity of the by-products with the raw materials or account for yield loss at every stage in the production of subject merchandise during the POR, as that information is not on the record because Tainai does not record the quantity of scrap produced. Further, Tainai has not provided evidence or precedent supporting its allocation methodology and the lack of production information to grant it a by-product offset.

IDM at 21 (APPX1023).

Commerce's questionnaire explicitly stated what information was needed to qualify for an offset: "By-product/co-product offsets are only granted for merchandise that is either sold or reintroduced into production during the POI/POR, up to the amount of that by-product/coproduct actually produced during the POI/POR." *Id*. (citing Tainai's Response to Section D Questionnaire at 25 (Nov. 12, 2021) (APPX2155)). Plaintiffs do not dispute that Tainai does not record the quantity of scrap produced, and their mere opinion that Commerce should value byproducts in a different manner is not sufficient to demonstrate error in Commerce's determination that the record did not provide evidence to support making the adjustment. Indeed, this Court has recently rejected the argument that the offset should be granted simply because "the quantity of scrap produced is the same as the quantity of scrap sold." *See Tainai*, 2023 WL 5974083, at *19. Substantial evidence supports Commerce's conclusion that Tainai failed to meet its burden to provide Commerce with information that would substantiate an offset for byproducts. *See Am. Tubular Prod*., 847 F.3d at 1361; *Tainai*, 2023 WL 5974083, at *19; 19 C.F.R. § 351.401(b)(1)-(2). Commerce's determination should be sustained.

## <u>CONCLUSION</u>

For the reasons above, we respectfully request that this Court deny plaintiffs' motion for judgment on the agency record.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

BENJAMIN JUVELIER
Attorney
Office of the Chief Counsel
  For Trade Enforcement & Compliance
Department of Commerce

September 21, 2023

/s/Geoffrey M. Long
GEOFFREY M. LONG
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington D.C.  20044
Tel:  (202) 307-0159
E-mail:  Geoffrey.M.Long@usdoj.gov

Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court, the Court's

Standard Chamber Procedures, and the Court's scheduling order (ECF No. 25) in that it contains

11,896 words, including text, footnotes, and headings.

/s/Geoffrey M. Long
GEOFFREY M. LONG

39

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:   THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| SHANGHAI TAINAI BEARING CO., LTD.<br>and C&U AMERICAS, LLC,<br><br>    Plaintiffs,<br><br>  and<br><br>ZHEJIANG JINGLI BEARING<br> TECHNOLOGY CO., LTD.,<br><br>    Plaintiff-Intervenor,<br><br>  v.<br><br>UNITED STATES,<br><br>    Defendant. | Court No. 23-00020 |

## <u>ORDER</u>

Upon consideration of the motion for judgment on the administrative record filed by plaintiff, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED;

ORDERED that the Department of Commerce's determination is affirmed in all respects; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated: _____  _____
   New York, N.Y.     JUDGE STEPHEN A. VADEN